**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Andres SEGURA and Luz Marina Colon, Defendants-Appellees.**

**No. 1711, Docket 81–1181.**

United States Court of Appeals, Second Circuit.

Argued Aug. 13, 1981.

Decided Nov. 6, 1981.

Rehearing and Rehearing In Banc Denied Dec. 30, 1981.

Peter A. Chavkin, Asst. U.S. Atty., Brooklyn, N.Y. (Edward R. Korman, U.S. Atty. for the E.D.N.Y., Vivian Shevitz, Asst. U.S. Atty., New York City, on the brief), for plaintiff-appellant.

Paul E. Warburgh, Jr., New York City (Axelrod & Warburgh, New York City, on the brief), for defendant-appellee Andres Segura.

Peter J. Fabricant, Brooklyn, N.Y. for defendant-appellee Luz Marina Colon.

Before MESKILL and KEARSE, Circuit Judges, and COFFRIN,* District Judge.

KEARSE, Circuit Judge:

The United States appeals from an order of the United States District Court for the Eastern District of New York, John R. Bartels, *Judge*, suppressing evidence seized by law enforcement officials from the apartment of defendants-appellees Andres Segura and Luz Marina Colon, who are charged in four counts of a five-count indictment with conspiracy to commit an offense under the narcotics laws in violation of 21 U.S.C. § 846 (1976), and with possession and distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) (1976). Some of the evidence seized from the apartment was discovered prior to the issuance of a search warrant and some was discovered in the search that followed issuance of the warrant. We affirm the district court's suppression of the pre-warrant evidence, but reverse the order to the extent that it suppressed evidence discovered after the issuance of the search warrant.

## FACTS

In January 1981, members of the New York Drug Enforcement Task Force ("Task Force"), having received information relating to heavy trafficking in cocaine, had begun a virtually constant surveillance of Segura and Colon. On February 12, at approximately 5:00 p.m., Task Force agents followed Segura and Colon to a Burger

* Honorable Albert W. Coffrin, of the United States District Court for the District of Vermont, sitting by designation.

King in Queens, where they observed Segura and Colon effect what appeared to be the delivery of a bulky item to Enrique Rivudalla-Vidal and Esther Parra. The agents followed Rivudalla and Parra, and at approximately 5:30 stopped them for questioning. Upon learning that a paper bag carried by Parra contained a glassine bag of white powder, the agents placed Rivudalla and Parra under arrest. The white powder was eventually determined to be approximately one-half kilogram of cocaine. After being advised of his constitutional rights, Rivudalla stated that he had received the cocaine from Segura. He added that they had originally planned a one kilogram sale, but that he had requested the smaller quantity because he was unsure of his ability to sell a full kilogram, and that Segura was to telephone him at approximately 10 p.m. to learn whether he had been successful in selling the half kilogram.

At approximately 6:30 p.m., one of the agents telephoned an Assistant United States Attorney for the Eastern District of New York to request permission to arrest Segura and Colon and authorization to search their apartment. The Assistant authorized the arrests, but stated that a search warrant was unobtainable that evening and instructed the agent merely to secure the apartment without searching it.

At 7:30 p.m. three agents, led by Special Agent Patrick Shea of the United States Drug Enforcement Agency ("DEA"), who was assigned to the Task Force, set up surveillance of the defendants' apartment from the fire stairs near the door of the apartment, 3D. At that time the agents had no reason to believe anyone was inside the apartment. No lights were visible. Shea pressed his ear to the apartment door, but heard no sounds from within. Segura's car was not parked in the vicinity. For nearly three hours no one entered or left the apartment as the agents watched from the fire stairs. At about 10:30 the agents left the fire stairs to set up surveillance outside the building.

At approximately 11:15 p.m. Segura entered the building alone. The agents followed him into the vestibule and, as he unlocked the inner door, arrested him. Agent Shea told Segura they were going to "go up to the apartment." Segura denied living in the building, but the agents forcibly took him to apartment 3D. Shea knocked on the door, which was answered by a woman later identified as Colon. Shea showed his badge and told Colon that Segura had been arrested and that a search warrant was being obtained; then he and the other agents and Segura entered the apartment. The agents neither requested nor received permission to enter.

Once inside, the agents discovered three other persons present with Colon. Two of the agents immediately conducted a security check to ensure that no one else was present who might constitute a threat to their safety or destroy evidence. During this limited inspection they discovered a triple-beam scale and several jars of lactose in plain view on a bedroom table and numerous small cellophane bags in a bedroom closet.

Eventually, Colon was placed under arrest, and she, Segura, and the other three persons found in 3D were taken to DEA headquarters. As Colon was preparing to depart, she sought to take her shoulder bag with her. Before permitting this, one of the agents searched the bag for a weapon and discovered a loaded .38 caliber revolver and more than $2,000 in cash.

Two agents remained in the apartment to secure it until a search warrant was issued. Because of "administrative delays," application for the warrant was not presented to a magistrate until approximately 5 p.m. the following day. The warrant was issued and then executed at about 6 p.m., some nineteen hours after the initial entry. In the search pursuant to the warrant agents discovered 1,250 grams of cocaine in an attache case, 58 grams of cocaine in the pocket of a coat in the bedroom closet, 18 rounds of .38 caliber ammunition, more than $50,000 in cash, and records of narcotics transactions. The agents seized all of these items, together with the items discovered during the security check of the previous night.

This prosecution followed. Segura and Colon moved to suppress the items seized from their apartment on the ground that the entry and search violated their rights under the Fourth Amendment to the Constitution. The government contended that the entry into the defendants' apartment was justified by exigent circumstances because the agents feared Colon would destroy the evidence they believed was there before a search warrant could be obtained. After an evidentiary hearing, the district court ruled that the entry was not justified. Further, the court concluded that although the search warrant eventually obtained was valid, all of the evidence seized should be suppressed because the 19-hour delay made execution of the warrant unreasonable and because had it not been for the unlawful entry, the evidence seized might not have been there 19 hours later.

The government has appealed, as permitted by 18 U.S.C. § 3731 (1976), and renews here its contention that exigent circumstances justified the entry. In the event that we reject this argument, the government urges that we reverse the suppression of evidence other than the gun since that evidence was not "seized" until after issuance of the search warrant, or, alternatively, that we reverse the suppression order insofar as it related to evidence discovered after issuance of the warrant.

## DISCUSSION

We conclude, on the authority of *United States v. Agapito*, 620 F.2d 324 (2d Cir.), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980), that the entry was not justified, but that the evidence discovered pursuant to the valid search warrant should not have been suppressed.

### A. *The Entry*

■ It is fundamental that warrantless searches and seizures are unreasonable within the meaning of the Fourth Amendment unless they fall within one of the few, well-delineated exceptions to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971). The government argues that the warrantless entry of the Task Force agents into the apartment of Segura and Colon to prevent the destruction of evidence was lawful under an exception for "exigent circumstances." Although this Circuit has upheld a warrantless entry into an apartment for the purpose of preventing the destruction of evidence, *United States v. Vasquez*, 638 F.2d 507, 529–32 (2d Cir. 1980), we conclude that the prerequisites for such an entry were not met in the present case.

The preconditions that will justify a warrantless entry into premises, following an arrest outside, for a security check to prevent the destruction of evidence were set forth by this Court in *United States v. Agapito, supra*. There we stated that

the arresting officers must have (1) a reasonable belief that third persons are inside, and (2) a reasonable belief that the third persons are aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public.

620 F.2d at 336 n.18. In *Agapito*, DEA agents had conducted a two-day surveillance of a 17th floor hotel room, following which they arrested, in the hotel lobby, the only two persons believed to have occupied the room. After the arrests the agents entered the room and seized a suitcase; they remained in the room intermittently for nearly twenty-four hours until a search warrant was obtained. We found that the actions of the agents satisfied neither prerequisite for a warrantless security check. First, the agents had no reason to believe that third persons were in the room, since their surveillance of the room had not revealed the presence of any occupants or visitors whom they had not already apprehended. Second, the arrest of the occupants had taken place in the hotel lobby, seventeen floors removed from the room. Thus, even if the agents here thought that accomplices remained in the room, there was no reason for them to believe that the accomplices knew of the arrests so that they might destroy evidence . . . .

*Id.* at 336. Hence we held that the entry into the hotel room was unlawful.

■ Despite the differences in times and distances, we find no material distinction between *Agapito* and the present case. The Task Force members in the present case had kept apartment 3D under surveillance for some three hours, during which they had seen no lights, heard no sounds, even with an ear pressed against the door, and seen no person entering or leaving. They had no reasonable belief that anyone was in the apartment. We are unpersuaded by the government's argument that Segura's arrival at home alone made it reasonable to believe that Colon was already at home. She could as easily have been elsewhere, especially since there had been no signs whatever that 3D was occupied. Nor is there reason to reach a contrary conclusion on the basis of the government's argument that Segura might have learned, through his expected 10 o'clock call to Rivudalla or otherwise, that Rivudalla had been arrested. The surveilling agents heard no sound of a telephone ringing in 3D nor any other activity to suggest that anyone had communicated that information to Colon.

Even if Segura's arrival alone made it reasonable to suspect that Colon was in 3D, there was no reason to believe that anyone in the apartment knew of Segura's arrest and was therefore about to destroy evidence. The arrest took place in the lobby of the apartment building, two floors below the apartment. The arrest could not have been observed from 3D, and there was no evidence that anyone saw the arrest and reported it to the inhabitants of 3D.

The government nonetheless attempts to bring the agents' actions within the second *Agapito* prerequisite by arguing that their knock at the door of 3D, along with the preceding commotion as they forcibly brought Segura to the apartment, alerted the inhabitants of the apartment to Segura's arrest and made it likely that they would destroy whatever evidence was there. Such exigency as inhered in these conditions, however, was of the agents' own making. They had no need to drag Segura

to his apartment or to knock at the door. We will not expand the exception made for emergency security checks by permitting the agents to "create their own exigencies . . . and then 'secure' the premises on the theory that the occupants would otherwise destroy evidence." *United States v. Allard*, 634 F.2d 1182, 1187 (9th Cir. 1980); *United States v. Rosselli*, 506 F.2d 627, 630 (7th Cir. 1974) (agents' knocking at door, creating emergency, did not exempt them from warrant requirement: "when the emergency justification is advanced, we believe it is appropriate to appraise the agents' conduct during the entire period after they had a right to obtain a warrant and not merely from the moment when they knocked at the front door.")

The government's reliance on our decision in *United States v. Vasquez, supra,* in which we upheld a warrantless entry for a security check, is misplaced since that decision was based on several facts that are not present here. First, the pertinent arrests in *Vasquez* took place on the street, within sight of the fourth-floor apartment in question, thus creating the risk at the outset that the arrests were known to those remaining in the apartment. Further, the circumstances in *Vasquez* made it quite reasonable for the agents to believe that someone remained in the apartment. And finally, one of the persons arrested on the street led the officers to an apartment on the second floor and attempted to have the occupant of that apartment give a false story on his behalf; the second-floor occupant became hysterical and the ensuing commotion could not help but alert anyone remaining in the fourth-floor apartment. The commotion in *Vasquez* thus was not instigated by the agents' tactics but by the arrestee's deceit.

In the present case, we agree with the conclusion of the district court that a warrantless entry of 3D to conduct a security check was not justified by the circumstances and that that entry was therefore unlawful.

## B. *The Post-Warrant Evidence*

Leaving aside for the moment the question of the evidence discovered upon the unlawful entry into the apartment, *see* C. *infra*, we turn to the question of the evidence discovered in the apartment after the issuance of the search warrant. The district court found that the warrant itself was valid, but ruled that the illegality of the initial entry, coupled principally with the unreasonableness of the delay in obtaining the warrant, required the suppression of the evidence discovered after the warrant was issued. We conclude that our prior decision in *United States v. Agapito, supra,* is controlling and requires the contrary result.

As discussed earlier, the agents in *Agapito* sought to justify their warrantless entry into a hotel room as a security check to prevent the destruction of evidence. We found the facts insufficient to justify a security check and ruled their entry unlawful. Notwithstanding the purported desire of the *Agapito* agents to make a quick security check, when they found the hotel room empty they did not simply secure it until a search warrant could be obtained; they "moved in" and remained there intermittently for nearly twenty-four hours before a warrant was obtained. During their unlawful stay in the room the agents seized a suitcase, although they did not at that time open it or otherwise search the room. Eventually a search warrant, which we held to be valid, was issued. Upon issuance of the warrant the agents searched the suitcase and discovered one kilogram of cocaine. Notwithstanding the illegal entry, the 24-hour delay in obtaining a warrant, and the agents' unlawful occupation of the room for that lengthy period, we held that the cocaine found in the suitcase should not be suppressed because the cocaine was discovered pursuant to a valid search warrant.

 We find no difference in the facts of the present case sufficient to justify deviation from the result reached in *Agapito.* Here, as there, there was an unlawful entry in circumstances that did not justify the intended security check of the premises; here the agents remained unlawfully on the premises for nineteen hours prior to issuance of a search warrant, as compared with twenty-four in *Agapito*; here there was a valid warrant, as there was in *Agapito*; and here, as there, we deal with evidence discovered after the valid warrant issued.

The only difference between the present case and *Agapito* is that in *Agapito* the hotel room was empty, whereas there were people in the Segura-Colon apartment, a difference we do not consider material. The district court gave effect to this difference by hypothesizing that, had there been no illegal entry, Colon and her companions might have destroyed the evidence in the apartment prior to the issuance of the warrant. The hypothesis that had it not been for the unlawful entry perhaps no evidence would have been discovered lawfully is unpersuasive, in part because it is based on wholly speculative assumptions, such as (1) that having decided not to enter the apartment until a warrant was obtained, the agents would nevertheless have taken Segura to the apartment and alerted Colon; or (2) that having decided not to enter prior to obtaining a warrant the agents would not have kept the apartment under surveillance; or (3) that, once alerted, Colon would have sought to eliminate the evidence (including valuable cocaine and more than $50,000 in cash) by destroying it within the apartment rather than by removing it from the apartment, so that the agents would have no opportunity to intercept persons removing evidence; or (4) that the destruction of nearly three pounds of cocaine, more than $50,000 in cash, numerous cellophane bags, and documents would be achieved without the telltale sounds of repeated toilet flushings or an odoriferous fire; or (5) that a triple-beam scale and eighteen rounds of ammunition could be destroyed silently.

Further, we cannot uphold the district court's decision to penalize the unlawful entry simply on the basis that persons were in the apartment who might otherwise have destroyed the evidence, because we find

such a basis prudentially unsound. Under Fourth Amendment jurisprudence the fact that such persons were present—meaning that the agents happened to be correct in one of the unsupported beliefs that led them to enter—does not legitimate the agents' entry; the reasonableness of the entry turns on the objective reasonableness of the beliefs, not on their accuracy. The effect of the district court's ruling, however, would be not only to preclude the officers' reliance on their happenstance accuracy, but in fact to penalize them for that accuracy. That is, upholding the district court's decision would mean that we suppress the evidence when, as here, the agents happened to be right in believing that there was someone in the premises to destroy it, while we do not suppress it where, as in *Agapito*, the agents' belief turned out to be wrong. We do not believe the appropriate protection of Fourth Amendment rights requires such an ironic twist.

In sum, *Agapito* is virtually indistinguishable from the present case and requires that the evidence discovered pursuant to the issuance of the valid search warrant not be suppressed.

### C. *The Pre-Warrant Evidence*

Finally, we reject the government's argument that the evidence discovered during the unlawful security check should not be suppressed because it was not actually "seized" until after the search warrant was obtained. While *Agapito* allows use of evidence discovered after the issuance of a valid search warrant, it does not forbid suppression of evidence discovered upon an unlawful entry prior to the issuance of the warrant. We are not inclined to extend *Agapito* to allow use of the unlawfully discovered pre-warrant evidence in this case where the agents literally and figuratively went out of their way to create the circumstances that they contend constituted the emergency justifying entry. In the words of *United States v. Rosselli, supra*, in which agents similarly knocked at the suspects' door and thus alerted them,

[w]e do not suggest that the emergency which did develop was contrived by the agents. They had a right to pursue their investigation by seeking voluntary cooperation from a suspect. But certainly the emergency which did ensue was foreseeable. Moreover, this type of situation may reoccur repeatedly and might lend itself to too easy a by-pass of the constitutional requirement that probable cause should generally be assessed by a neutral and detached magistrate before the citizen's privacy is invaded.

506 F.2d at 630. Given the potential for abuse of the emergency security check exception by officers who would create their own emergencies, we believe it appropriate " 'to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' " *Brown v. Illinois*, 422 U.S. 590, 599–600, 95 S.Ct. 2254, 2259–60, 45 L.Ed.2d 416 (1975), quoting *Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960). Accordingly, we uphold the suppression of such evidence as was discovered upon the unlawful entry.

### CONCLUSION

The order of the district court is affirmed insofar as it suppressed items discovered prior to the issuance of the search warrant, and reversed insofar as it suppressed items discovered after issuance of the warrant.