**UNITED STATES of America, Appellee,**

**v.**

**Harold CATTOUSE, Defendant-Appellant.**

**No. 439, Docket 87-1355.**

United States Court of Appeals, Second Circuit.

Argued Dec. 8, 1987.

Decided May 5, 1988.

with the district judge that the warrantless arrest was justified under the exigent circumstances doctrine, and that it was reasonable for the agents here not to obtain a warrant earlier in the operation, 666 F.Supp. 480, we affirm.

Abraham L. Clott, New York City (The Legal Aid Society, Federal Defender Services Unit, of counsel), for defendant-appellant.

Alfred U. Pavlis, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., John F. Savarese, Asst. U.S. Atty., of counsel), for appellee.

Before FEINBERG, Chief Judge, OAKES, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

This appeal raises the question of whether exigent circumstances that arise foreseeably as the result of a government-controlled purchase of narcotics justify a warrantless arrest of the target of the investigation in his home. Harold Cattouse appeals from a judgment of the United States District Court for the Southern District of New York, Charles S. Haight, *Judge*, convicting him of conspiracy to distribute phencyclidine ("PCP") in violation of 21 U.S.C. § 846, and distribution of PCP in violation of 21 U.S.C. §§ 812, 841(a)(1), and 845(a). Cattouse entered a conditional guilty plea, reserving his right to appeal the district court's denial of his motion to suppress statements and physical evidence that were the fruits of his warrantless arrest.

At the suppression hearing the government argued that exigent circumstances justified the warrantless arrest and that, therefore, statements made by Cattouse and the $3,000 in buy money seized at the time of the arrest should not be excluded from evidence. Cattouse argued that, because the exigent circumstances were foreseeable, the agents should have obtained a warrant earlier in the day, and cannot rely on circumstances they created to justify the warrantless arrest. Because we agree

## BACKGROUND

Special agent Timothy Higgins of the United States Drug Enforcement Administration ("DEA") initiated the investigation that led to Cattouse's arrest. According to Higgins' testimony at the suppression hearing, a confidential informant had contacted Higgins and stated that he had arranged a purchase of PCP in the neighborhood of 164 W. 133 Street from a person named "Yogi". On May 9, 1986, Higgins, another agent, and the informant drove to the target area where Higgins gave the informant $300. Between 10:30 a.m. and 11:00 a.m., the informant returned with a small bottle of liquid PCP. The informant explained that he had met Yogi, had entered 164 W. 133 Street, and had proceeded to an apartment on the second or third floor where Yogi had knocked on the door and an individual had handed him the bottle of PCP in exchange for the $300. Judge Haight found that, while the informant had not seen the individual who handed the bottle to Yogi, a few moments later a person the informant described only as a "fat black guy", later identified as Cattouse, had met the informant in the hallway bathroom and assured him that the PCP was "good stuff".

The two agents and the informant then returned to headquarters. Although they had a general physical description, they had not yet identified the "fat black guy" as Harold Cattouse. The agents decided to attempt a larger buy that afternoon. At about 2:00 p.m., five agents, all white, drove back to the predominantly black neighborhood with the informant and set up limited surveillance of 164 W. 133 Street. The informant told the agents that there were lookouts in the area, so to avoid detection, the agents moved frequently.

The informant returned to the third floor apartment at 164 W. 133 Street and arranged to buy 16 ounces of liquid PCP from Cattouse for $3,000. According to the informant, Cattouse then left to obtain the PCP. Although the agents had continued their surveillance, they did not observe Cattouse leaving the building.

Later, at about 3:10 p.m., however, they saw a man matching the informant's description of Cattouse entering the apartment house carrying a brown paper bag. When the informant telephoned a number either Yogi or Cattouse had given him earlier, the woman who answered confirmed that Cattouse had returned. The informant then went to the apartment with the $3,000 government buy money and completed the purchase.

When the informant emerged with a brown paper bag containing a 16 ounce bottle filled with liquid PCP, approximately fifteen to twenty minutes later, he told the agents that a tall black man and two black women were also in the apartment or in the hallway area with Cattouse. The agents decided to try to make an arrest and, while Higgins attempted to get to the back of the apartment building, the other agents followed the informant up to Cattouse's apartment. At approximately 4:00 p.m., when the apartment door was opened to the informant's knock, the agents entered the apartment, seized the $3,000 marked buy money, and arrested Cattouse, informing him of his rights. In an interrogation immediately following this arrest, the agents elicited inculpatory statements from Cattouse. Through his suppression motion Cattouse unsuccessfully sought to prevent those statements and the buy money from being admitted into evidence.

## DISCUSSION

On appeal, Cattouse contends that the exigent-circumstances exception to the general rule requiring a warrant for an arrest in a person's home should not apply here, because the only exigency, fear that evidence would be removed or destroyed, arose because the agents had planned the operation so as to arrest the suspect with marked buy money.

A warrantless arrest of a person in his own home is "presumptively unreasonable", *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), and therefore prohibited by the fourth amendment, unless the government can show that "exigent circumstances" required that the arrest be made before a warrant could be obtained. *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 2098, 80 L.Ed.2d 732 (1984). The question here is whether the government met its burden of demonstrating "exigent circumstances" that justified Cattouse's arrest without a warrant.

Several factors help to determine whether exigent circumstances exist at the time of an arrest.

> These include (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause * * * to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*United States v. Martinez–Gonzalez*, 686 F.2d 93, 100 (2d Cir.1982) *quoting, United States v. Reed*, 572 F.2d 412, 424 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978). *See also Welsh v. Wisconsin*, 466 U.S. at 753, 104 S.Ct. at 2099. This list is "illustrative, not exclusive", *United States v. Martinez–Gonzalez*, 686 F.2d at 100.

We are satisfied that the district court's finding of exigent circumstances in this case, based on the first four of these factors, is not clearly erroneous. Distributing narcotics is unquestionably a most serious offense, *see United States v. Martinez–Gonzalez*, 686 F.2d at 100–01, and, as this court has often observed, narcotics dealers are frequently armed. Based on ample evidence in the record, Judge Haight found that, at the time of the arrest, the agents had both probable cause to believe that Cattouse had committed the crime as well as a strong reason to believe that he was in the apartment.

The district court did not find either a "likelihood that the suspect [would] escape" or a peaceful entry, but, in determining whether or not exigent circumstances existed, "[t]he presence or absence of any one factor is not conclusive; rather, the essential question is whether there was 'urgent need' that 'justif[ied]' the warrantless entry." *United States v. Jose Crespo*, 834 F.2d 267, 270 (2d Cir.1987) (citations omitted).

Additional circumstances also support the district court's finding of exigent circumstances. The agents, who had not seen Cattouse leave the building earlier in the afternoon when he went to acquire the PCP, concluded that there was a substantial risk that Cattouse, or another person, would be able to leave the building undetected and remove the marked buy money. Any attempt in this predominantly black neighborhood to observe the building more thoroughly would have exposed the agents, all of whom were white, to a greater risk of detection. Indeed, merely as time passed, the danger that the agents would be detected increased, and so did the probability that a confrontation with Cattouse would be violent.

Cattouse does not seriously dispute the district court's finding that by the time the arrest was made exigent circumstances did exist. Rather, relying primarily on *United States v. Segura*, 663 F.2d 411 (2d Cir. 1981), *aff'd on other grounds*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), Cattouse contends that these exigent circumstances could not justify the warrantless arrest because the exigency was foreseeable and was created by the agents.

■ Cattouse contends that the agents created the exigency first by failing to seek a warrant earlier in the day based on the informant's $300 purchase. After the morning buy, however, the agents still did not know Cattouse's name or whether he lived on the second or third floor of the building. Moreover, the informant had not seen who had sold the PCP to Yogi. Even if the informant's testimony that it was Cattouse that he met in the hallway bathroom shortly after the morning sale might have supported a warrant for Cattouse's arrest, narcotics agents are not compelled to seek a warrant immediately upon learning that a criminal act has been committed; they are permitted to wait "until such time as events ha[ve] proceeded to a point where the agents could be reasonably certain that the evidence would ultimately support a conviction." *United States v. Montiell*, 526 F.2d 1008, 1010 n. 1 (2d Cir.1975) (citation omitted).

Moreover, even if the agents might have been able to obtain a warrant earlier in the day, their failure to do so at the first opportunity does not bar them from acting on an exigency that arises later. *See Cardwell v. Lewis*, 417 U.S. 583, 595–96, 94 S.Ct. 2464, 2472, 41 L.Ed.2d 325 (1974) ("the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action").

■ Cattouse also argues that the agents should have sought a warrant during the events of the afternoon, but before the informant had completed his purchase of PCP. However, the unfolding events of the afternoon investigation did not produce evidence of criminal activity by Cattouse that would support a conviction until after the sale of PCP was completed, at approximately 3:30 p.m. Prior to that time, the agents had only the uncorroborated word of the informant that Cattouse had expressed a willingness to obtain PCP for him. We thus agree with the district court that the agents' conduct in not applying for a warrant before the afternoon buy was consummated was reasonable.

■ Cattouse further suggests that even after the afternoon buy was completed the agents could have applied for a warrant by telephone, pursuant to Fed.R.Crim.P. 41(c)(2). Once the deal was completed, it was reasonable for the agents to believe there was insufficient time to obtain a warrant, even by telephone. Only twenty to thirty minutes elapsed from the time the informant consummated the sale to the time the agents actually arrested Cattouse. At least part of that time was, necessarily, spent obtaining information from the informant about the sale. As we have recently explained, even under the procedure for issuance of a warrant by telephone, "a

reasonable period of time, surely most often one longer than twenty minutes, must be allowed for reaching a magistrate", *United States v. Gallo–Roman,* 816 F.2d 76, 81 (2d Cir.1987), as well as time to prepare the duplicate original warrant and read the information to the magistrate, and time for the magistrate carefully to consider the application. Under the circumstances here, we conclude, as we did in *United States v. Gallo–Roman,* that "twenty minutes is hardly a sufficient period of time in which to effectuate the procedures contemplated by Rule 41." 816 F.2d at 81.

■ We find no merit to Cattouse's argument that the agents intentionally created the exigency by using buy money and an all-white surveillance team for the operation. Judge Haight properly found that the investigative techniques were appropriate and were not adopted for the purpose of creating exigent circumstances.

Nor does our determination that a warrantless arrest was justified in this case swallow the general rule prohibiting warrantless arrests in the home. This case is not like *United States v. Segura,* 663 F.2d 411, where the police were able safely to conduct surveillance of an apartment for three hours and created an exigency by their own actions. Here, the agents were unable to maintain close surveillance of Cattouse's apartment, and the exigency arose not from the agents' conduct but because of the suspect's activity. The agents were in a potentially dangerous situation that might explode at any moment. They certainly could not assure stability while they sought a warrant. The likelihood that the buy money would be removed from the apartment, the ever-increasing risk that the agents would be detected, and the increasing danger of provoking a violent confrontation, fully justified the agents' decision to make the arrest without first obtaining a warrant.

Affirmed.

OAKES, Circuit Judge (dissenting):

I respectfully dissent.

In the past I have warned of the dangers inherent in the continued broadening of the definition of "exigency" as that term is used in marking out the exigent circumstances "exception" (as it has grown to be)[1] to the warrant clause of the Fourth Amendment and expressed my fears that in time the exceptions will swallow up the clause entirely. *See, e.g., United States v. Martino,* 664 F.2d 860, 878 (2d Cir.1981) (Oakes, J., concurring) ("To the individual law enforcement officer, the circumstances for a warrantless search and seizure always appear exigent."), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). Here the majority continues that trend, by overlooking the essence of the exception and finding "exigent circumstances" in a situation manufactured by the law enforcement authorities.

In the first place, the warrantless arrest occurred shortly after what is known in the trade as a "controlled buy" or "buy and bust" operation. Moreover, this was the *second* such controlled buy made from the same person in the same day.

Second, a principal fact relied on to make the circumstances "exigent"—defined by Webster's Third New International Dictionary as "requiring immediate aid or action" —was that the neighborhood in which the agents were working was black and the agents white, thereby increasing the likelihood that their surveillance would be detected. The agents persisted in this arrangement even though their informant

---

**1.** In *United States v. Martino,* 664 F.2d 860, 878 (2d Cir.1981) (Oakes, J., concurring), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982), I noted that I did not "read any Supreme Court case as going so far as to hold that there is a categorical exception for 'exigent circumstances,' although some cases do refer to that phrase." *Id.* at 878. Rather, I thought then, as I do now, that the Court's discussions of exigent circumstances are meant to apply to those isolated cases which defy categorization, those "not amenable to pre-conceived rules."

*Id.* at 879. Although the Court uses the phrase "exigent-circumstances exception" in *Welsh,* 466 U.S. at 749, 104 S.Ct. at 2097, its treatment of the concept, and in particular its refusal to delineate the scope of such an exception, instructs against a rigid application of pre-established categories. Unfortunately, I believe the majority's approach does precisely that, in focusing almost entirely on particular factors, while paying little attention to the overall operation, and even less attention to the interests the Fourth Amendment was designed to protect.

had previously warned that there were "lookouts all over the area."

Third, the district court found that the agents' principal concern was not the possibility of violence but the loss of the marked buy money. Judge Haight noted that "any meaningful threat of government involvement could have caused Cattouse to resort to the simple expedient of sending the buy money elsewhere with someone else."

I had thought that *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), had reaffirmed the proposition that warrantless home arrests were generally improper, absent probable cause and exigent circumstances, and had defined the latter as an "emergency or dangerous situation," *id.* at 583, 100 S.Ct. at 1378. *See Welsh v. Wisconsin*, 466 U.S. 740, 749–50, 104 S.Ct. 2091, 2097–98, 80 L.Ed.2d 732 (1984) (Supreme Court emphasized that of "few" exceptions to the warrant requirement, only "hot pursuit" doctrine has been applied to warrantless arrests in the home and, in all cases, police bear a heavy burden in showing urgent need). Here, I note incidentally, the agents probably could have obtained a warrant after the morning buy, since the informant told them that appellant had "touted the quality of the drug in the bathroom after the informant had received it" (Gov't Br. at 12) (emphasis omitted), *and* appellant had "agree[d] with the informant to obtain a larger quantity of PCP" (Gov't Br. at 12). On the Government's own theory of narcotics conspiracy, upheld, for example, in *United States v. Brown*, 776 F.2d 397 (2d Cir.1985), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986), there was probable cause to think appellant was a conspirator with the actual seller in the morning transaction. At the very least he might have been treated as an aider and abettor. But as the agents made no attempt to obtain a warrant, we can only speculate.

I had thought as well that this court had held explicitly in *United States v. Segura*, 663 F.2d 411 (2d Cir.1981), *aff'd on other grounds*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), that "[w]e will not expand the exception made for emergency security checks by permitting the agents to 'create their own exigencies ... and then

"secure" the premises on the theory that the occupants would otherwise destroy evidence.'" *Id.* at 415 (quoting *United States v. Allard*, 634 F.2d 1182, 1187 (9th Cir. 1980), and citing *United States v. Rosselli*, 506 F.2d 627, 630 (7th Cir.1974) (Stevens, J.)). *See also United States v. Webster*, 750 F.2d 307, 327–28 (5th Cir.1984) (distinguishing between circumstances arising naturally during a delay and those "deliberately created" by the officers), *cert. denied*, 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985); *see generally* 2 W. LaFave, *Search and Seizure* § 6.1(f) at 600–02 (2d ed. 1987). *Segura*, like this case, involved the failure of law enforcement officers to foresee the likely consequences of their actions and to obtain a warrant in the event those circumstances played themselves out. 663 F.2d at 415; *see also United States v. Rosselli*, 506 F.2d at 630; *United States v. Munoz–Guerra*, 788 F.2d 295, 298–99 (5th Cir.1986). As such, *Segura* and the principle it espouses apply especially to a controlled drug buy. *See United States v. Collazo*, 732 F.2d 1200, 1204 (4th Cir.1984), *cert. denied*, 469 U.S. 1105, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985). *Cf. United States v. Morgan*, 743 F.2d 1158 (6th Cir.1984) (claimed exigencies not compelling when arrest had been planned), *cert. denied*, 471 U.S. 1061, 105 S.Ct. 2126, 85 L.Ed.2d 490 (1985); *United States v. Scheffer*, 463 F.2d 567, 570, 575 (5th Cir.), *cert. denied*, 409 U.S. 984, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972).

I am also troubled by the majority's willingness to find exigent circumstances based largely on generalizations about the habits and practices of drug dealers. Relying on the first four factors enumerated in the expressly nonexhaustive *Martinez–Gonzalez* listing, the majority correctly notes that the sale of PCP is a most serious offense and that drug dealers are frequently armed (though there were no arms involved in this case). The district judge also credited testimony that "narcotics dealers often use lookouts" to warn of possible police activity, which he then used to support the conclusion that the marked buy money might be taken from the apartment by a runner because, as the agents testified, "narcotics sellers often use 'runners'"

**150**

to transport cash proceeds. So, with the general knowledge that drug dealers often use guns, lookouts, and runners, all that is needed to create exigence is an operation using marked buy money, probable cause, and a strong possibility that the suspect is in the apartment to be entered. Perhaps we should be more forthright and say that the Fourth Amendment's warrant requirement is simply inapplicable in drug buy cases. *See* Kamisar, *"Comparative Reprehensibility" and the Fourth Amendment Exclusionary Rule*, 86 Mich.L.Rev. 1, 11–32 (1987). Such a rule would be a very small step from where the majority has left us.

I could prolong this dissent. I end it with a sense of futility. To my mind the majority's willingness to expand the exigent circumstances exception is but another sad paragraph in a book that could be entitled *The Erosion of the Fourth Amendment*. And I fear the chapters that have yet to be written.