**UNITED STATES of America,**

v.

**Jaime SANCHEZ a/k/a Juan Carlos Salcedo and Augusto Reynoso Nunez, Defendants.**

**No. 89–CR–49.**

United States District Court, E.D. New York.

Aug. 10, 1989.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Beryl Howell, Asst. U.S. Atty., of counsel), for U.S.

Christopher Chan, New York City, for defendant Sanchez.

Jorge Guttlein, New York City, for defendant Reynoso–Nunez.

## MEMORANDUM–DECISION and ORDER

.BARTELS, District Judge.

The Government moved for reargument of the Court's decision to suppress evidence in the above-captioned case. The Court granted the motion and, having received further briefing from both sides, renders this decision.

## STATEMENT OF FACTS

The testimony at the suppression hearing established the following facts:

In late November or early December of 1988, surveillance of 147–37 Roosevelt Avenue, Apartment 4C, Queens, New York, was commenced by the Drug Enforcement Agency upon reports of drug activity from neighbors having regular access to the building. The description of one of the occupants of apartment 4C matched an individual, Jaime Sanchez, one of the defendants here. On January 4, 1989, Sanchez was observed in a white Honda automobile parked outside of the Roosevelt Avenue address.

On January 19, 1989, while surveillance was being conducted in front of 147–37 Roosevelt Avenue, two females drove up in a white Honda and parked across the street. One female exited the Honda, entered the building, and returned accompanied by defendant Sanchez who drove the Honda a block or two and then made a call from a public telephone.

Sanchez then drove the Honda to an apartment complex at 34th Road and Leavitt Street where he left the two women in the car, entered the complex, and returned shortly thereafter. After driving a block or two further, he again used a public telephone. Sanchez next drove to 110–17 63rd Road where he entered the premises empty-handed, leaving the two women in the car. Several minutes later, he returned to the car with a yellow plastic Key Food shopping bag. At the suppression hearing surveillance agent Dolinsky testified that the bag had "some weight to it." Dolinsky later said that, while he did not know what the bag contained, it could have contained cereal boxes. He subsequently amended this answer further, and said that he thought the bag contained several kilos of cocaine.

When Sanchez returned to the car, he opened the trunk and placed the bag inside. He then got in the driver's seat, backed up the car to the corner (going the wrong way on the one-way street), and made a right turn. Dolinsky testified that as Sanchez drove he appeared to look in the side and rear-view mirrors frequently in a "surveillance-conscious" manner. As the Honda was entering the feeder lane for the Horace Harding Expressway, an unmarked police car driven by Detective Birnstill pulled in front of it, and one driven by Agents Dolinsky and Lohan pulled behind it, thus ensuring that the Honda could not proceed. Agent Dolinsky's car had a red police light flashing on the front dashboard.

At this point, Agent Dolinsky, with his gun drawn but held at his thigh, approached the driver's side of the car, wearing his identification shield around his neck. Birnstill, also with his gun drawn, approached the passenger side of the vehicle. Dolinsky identified himself as a police officer and instructed Sanchez to get out of the car. While Sanchez was getting out, Dolinsky noticed a gun (subsequently determined to be a loaded .45) tucked in the front waistband of Sanchez's pants. Dolinsky then informed his fellow agents that Sanchez was armed. Dolinsky and Lohan seized the gun, put Sanchez's hands on the car, and patted him down, revealing a beeper in Sanchez's waistband. Sanchez was handcuffed, and Dolinsky took the keys out of the ignition and opened the trunk. He recovered from the trunk the yellow plastic bag which he had seen Sanchez place there, and found that it contained over $75,000 of United States currency in denominations ranging from one to one hundred dollar bills.

Meanwhile, on the passenger side of the vehicle, Birnstill had identified himself as a police officer, and had ordered the two women to get out of the car. He lined them up by a nearby fence and placed handcuffs on them.

Sanchez and the two females were then transported to the 112th Precinct in Queens where Sanchez was advised of his rights in Spanish. He gave the false name of Juan Carlos Salcedo, but fingerprint tests subsequently revealed his identity as Jaime Sanchez. Sanchez gave 147–37 Roosevelt Avenue, Apartment 4C, as his address, and stated that he had picked up the money at 110–17 63rd Road. Cocaine traces were later found on the front seat and floor of the white Honda.

The agents then returned to the premises of 110–17 63rd Road. They knocked on the door three or four times yelling, "Police," but received no response. At the third knock Birnstill leaned over the stoop, looked in the front window, and saw a man crawling across the floor toward sliding glass doors at the rear of the house which led to the outside. At that point the agents forced the front door open and entered with guns drawn. Some agents went to the second floor of the home where the bedrooms were located and others remained on the first floor where the kitchen, living room, and dining area were located. In one bedroom they located the defendant Augusto Reynoso–Nunez and another male, Salazar Diego–Ramos. In another bedroom they found two children and a female baby sitter. After checking all rooms and closets, and after looking under the beds and behind the shower curtains, to ensure that there were no other persons on the premises, the agents placed the man who had been crawling on the first floor, George Torres, in the bedroom with Reynoso and Diego–Ramos and handcuffed all three men. Birnstill read Reynoso his rights in English and Reynoso acknowledged that he understood. Since the other two men found in the house did not appear to comprehend English, Birnstill handed them a copy of their *Miranda* rights in Spanish.

Birnstill noticed cash and a bag of rubber bands lying on a television stand and on the floor. He also noticed a pair of shoes in the closet with .38 caliber guns stuck in them. Once the premises were "secured" Agent Dolinsky proceeded to the United States Courthouse in the Eastern District of New York to draft an affidavit in support of a search warrant to search the 63rd Road address. When he received the signed warrant he notified the other agents

by telephone, and the agents at the home then began their search.

In addition to the items Birnstill had previously discovered, the search revealed two boxes of ammunition for a .38 caliber gun, bullets for a pistol of a different caliber, two passports belonging to Reynoso, a ledger allegedly recording narcotics transactions, and two yellow bags identical to the one recovered from Sanchez's car.

Subsequently, Reynoso made a statement that the ledger found in the closet belonged to him and was a record of narcotics transactions, and that the names in the front of the ledger were the names of his customers and the name "El Turo," which appeared at the back of the ledger, was the alias of his supplier. Reynoso further stated that Sanchez had picked up money from him on more than one occasion, and that Sanchez and "El Turo" had delivered cocaine in the past.

## DISCUSSION

### I.

### Illegal arrest of Sanchez

There is a difference between the standard required for an "investigatory stop" and the standard required for an arrest. Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), involving pedestrians, and under *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) and *United States v. Forero*, 623 F.Supp. 694 (E.D.N.Y.1985), involving vehicles, if the agents have a "reasonable or founded suspicion" based on articulable facts that a criminal act was committed or was about to be committed they can make an "investigatory stop." This "reasonable suspicion" standard does not rise to the level of probable cause required for an arrest. However, facts arising after the stop may cause the reasonable suspicion to "ripen" into probable cause for arrest. *United States v. Greene*, 783 F.2d 1364 (9th Cir.1986).

■ Under the facts of this case the only arguable connection with drugs to substantiate a reasonable suspicion for an investigatory stop is the fact that unidentified residents of 147–37 Roosevelt Avenue had reported to authorities that some sort of unspecified drug transactions took place at apartment 4C, and that Sanchez matched the description by the neighbors of someone who lived in apartment 4C. The "reasonable suspicion" standard, however, was fulfilled neither by this information nor by subsequent events.

■ The surveillance of Sanchez led from Roosevelt Avenue to 34th Road and Leavitt Street where there was no evidence of any drug connection and, thereafter, to 110–17 63rd Road which was a home in a quiet neighborhood where, likewise, there had been no evidence of any drug trafficking. The fact that Sanchez left the white Honda, entered the house empty-handed, and returned with a yellow plastic Key Food shopping bag which he placed in the trunk is not sufficient, even in conjunction with all the other circumstances, to justify a reasonable suspicion of illegal activity. There was no basis to believe the yellow shopping bag contained drugs or money, it could have contained potatoes or any other object; this is particularly true since there was no suspicion or evidence connecting the home at 63rd Road with any drug activity. Sanchez was not reputed to be a narcotics trafficker, nor was he known to be armed, nor was he seen using a beeper when he placed the calls from the public telephones. The necessary connecting links were too tenuous and ambiguous to justify a reasonable suspicion.

■ Finally, reasonable suspicion did not develop after Sanchez left the 63rd Road address. The Court does not agree with Agent Dolinsky that Sanchez's frequent glances into his side and rearview mirrors showed him to be "surveillance-conscious." The testimony just as well indicated that, since Sanchez was in the process of backing up on a street and then entering a highway via a "feeder lane," he was exercising the normal safety precaution of frequently glancing in his side and rearview mirrors.

■ In addition, the so-called "investigatory stop," though not justified, turned

out to be more. The agents pulled one of their cars in front of the white Honda car and another agent's car in the back of the Honda, so that the defendant's freedom of movement was completely restrained. At the same time, several officers, with their guns drawn, surrounded the Honda, and the agent's car in back of the Honda had a red police light flashing on its dashboard. Furthermore, none of these actions by the agents had been necessitated by Sanchez's conduct. Considering all of these circumstances, the agents had effected an arrest of Sanchez even before he was ordered out of the car: no reasonable man could have thought he was free to leave. *Cf. Michigan v. Chestnut,* 486 U.S. 567, 108 S.Ct. 1975, 1979–80, 100 L.Ed.2d 565 (1988). *See also United States v. Marin* 669 F.2d 73 (2d Cir.1982); *United States v. Ceballos,* 654 F.2d 177 (2d Cir.1981). There was no probable cause for such an arrest. The fact that subsequently there was found on Sanchez a beeper and a gun is irrelevant to determining probable cause. Therefore, the Court holds that Sanchez's arrest was illegal, and that Sanchez's suppression motion is hereby granted in full. This, however, does not end the inquiry as far as defendant Reynoso is concerned.

## II.

### *No standing to object to fruits of Sanchez's illegal arrest*

■ Reynoso's suppression motion must stand or fall on his own Fourth Amendment rights and not on Sanchez's illegal arrest. *See Rakas v. United States,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). "[A] defendant, in any event, can prevail on a 'fruit of the poisonous tree' claim only if he has standing regarding the violation which constitutes the poisonous tree." W. LaFave, *Search & Seizure* § 11.4 at 371 (2d ed. 1987) (footnote omitted). Reynoso has no standing to make a "fruit of the poisonous tree" claim as to the information and items derived from the illegal arrest of Sanchez.

In *United States v. Davis,* 617 F.2d 677 (D.C.Cir.1979), the illegal search of a co-defendant's apartment led to an otherwise legal search of defendant's home. The Court of Appeals for the D.C. Circuit held that the items found in defendant's home were properly admitted at defendant's trial. The defendant had no standing to complain of the "poisonous tree"—i.e., the illegal search of his co-defendant's apartment—thus, he could not claim that the search of his home and the items seized therefrom were inadmissible "fruit" even though the illegal search of the co-defendant's apartment had led to the search of the defendant's home. *Id.* at 689–90. There is "no authority that holds that a defendant may suppress evidence seized from him as a fruit of a violation of fourth amendment rights which he does not have standing to challenge. There is ample authority to the contrary." *United States v. Williams,* 565 F.Supp. 353, 352–63 (N.D.Ill.1983) (citing cases).

Since Reynoso can claim no expectation of privacy over Sanchez's person or over the car Sanchez was driving, the information and items derived from Sanchez's illegal arrest may be used against Reynoso without violating the exclusionary rule or offending the Fourth Amendment. *See United States v. McConnell,* 500 F.2d 347, 348 (5th Cir.1974) (per curiam) (where defendant was apprehended after chain of events commenced by illegal search of co-defendant's car, defendant had no standing to make "fruit of poisonous tree" claim as to his arrest nor could he complain of illegal car search).

## III.

### *Search of 110–17 63rd Road*

■ Reynoso's standing to object to the search of 110–17 63rd Road, however, rests on different ground. The Court finds that, although he is not the owner of the premises, he does have standing to object to the search. The fact that he lived at the premises with the permission of the owner and stored his belongings there indicates that he had a legitimate expectation of privacy in the premises that was protected by the Fourth Amendment. *See generally United States v. Rojas,* 655 F.Supp. 1156, 1167

(E.D.N.Y.1987) (listing factors to be considered in determining standing to raise Fourth Amendment challenges to search of premises). Since Reynoso has standing as to this search, the Government is required to justify its intrusion into his abode without a warrant.

The Court first notes the general rule that a warrantless search of a home is prohibited even when made upon probable cause. *Vale v. Louisiana,* 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970); *Chimel v. California,* 395 U.S. 752, 760–62, 89 S.Ct. 2034, 2038–39, 23 L.Ed.2d 685 (1969); *United States v. Christophe,* 470 F.2d 865, 869 (2d Cir.1972), *cert. denied,* 441 U.S. 964, 93 S.Ct. 2140, 2162, 36 L.Ed.2d 684 (1973). "It is fundamental that warrantless searches and seizures are unreasonable within the meaning of the Fourth Amendment unless they fall within one of the few, well-delineated exceptions to the warrant requirement." *United States v. Segura,* 663 F.2d 411, 414 (2d Cir.1981), *aff'd,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).

The Government makes two alternative arguments to establish an exception to the warrant requirement here.[1] The first contention relies on the type of "security sweep" authorized by the Second Circuit in *United States v. Agapito,* 620 F.2d 324 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980). The Government claims that because of the recent visit of Sanchez and all that was learned from his illegal arrest, the agents had reason to believe that the house on 63rd Road was connected in some way with narcotics and possibly harbored weapons, evidence, and narcotics traffickers. From this it is

claimed that when the agents saw a man apparently attempting to crawl to the back door and escape they had a right to enter the house without a warrant and "secure" the premises from within by conducting a *search,* albeit limited in scope.[2] Second, pointing to the Supreme Court's language in *United States v. Segura,* 468 U.S. 796, 820, 104 S.Ct. 3380, 3393, 82 L.Ed.2d 599 (1984), the Government claims that the agents had the authority to enter and "secure" both the premises and the *"status quo "* while they were in good faith seeking a search warrant. Neither *Agapito* nor *Segura,* however, authorize the intrusion made in this case.

 One of the recognized exceptions to the warrant requirement is the entry onto premises, after an arrest made outside those premises, to conduct a security check for the purposes of preventing the destruction or loss of evidence or to protect the police or public from being harmed. *United States v. Agapito,* 620 F.2d at 336. For such an intrusion to be justified, "the arresting officers must have (1) a reasonable belief that third persons are inside, and (2) a reasonable belief that the third persons are aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public." *Id.* at 336 n. 18. *See also United States v. Jackson,* 778 F.2d 933, 937 (2d Cir.1985); *United States v. Segura,* 663 F.2d at 414.

 Here, Sanchez's arrest occurred quite a distance away from the house, and there was no evidence that the occupants of the house were destroying evidence or were in any way aware of the arrest until the officers banged on the front door and

---

1. In its latest submission to the Court the Government again contends that
 the testimony at the suppression hearing firmly established the exigent circumstances for the agents' initial entry into Reynoso's residence, since Detective Birnstill testified that he had observed a man inside the premises attempting to flee from the police. In any event, the Supreme Court made clear in *United States v. Segura,* 468 U.S. 796 [104 S.Ct. 3380, 82 L.Ed.2d 599] (1984), that agents may secure a premises while in good faith seeking to obtain a search warrant.

Letter from Government to Court, dated July 20, 1989, at 3.

2. As part of the security sweep in this case the agents "secure[d] the [occupants of the premises] in one place and then ... look[ed] around at all the rooms, open[ed] the closets to make sure no one [was] hiding in the closets, in the bathrooms, behind the shower curtains," (Tr. 36) "under the beds." (Tr. 167) *See United States v. Agapito,* 620 F.2d at 335 (defining "security check").

yelled, "Police!" It was only then that Agent Birnstill looked in the front window and saw George Torres crawling across the floor toward sliding glass doors at the rear of the house. The Second Circuit Court of Appeals has made it clear that, where an exigency is agent-created, the agents cannot subsequently justify a warrantless entry by crying "exigent circumstances": "We will not expand the exception made for emergency security checks by permitting the agents to 'create their own exigencies ... and then "secure" the premises on the theory that the occupants would otherwise destroy evidence.'" *United States v. Segura*, 663 F.2d at 415 (quoting *United States v. Allard*, 634 F.2d 1182, 1187 (9th Cir.1980)). Here, then, the Government's claim of "exigent circumstances" does not justify the warrantless entry under *Agapito* because the exigency was agent-created.

The Government contends, in the alternative, that the limits placed on the security check exception to the warrant requirement by *Agapito* and by the Court of Appeals in *Segura* were swept away by the Supreme Court's opinion in *Segura* wherein the Court stated:

> Specifically, we hold that where officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while, others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.

468 U.S. at 798, 104 S.Ct. at 3382. This passage supports the Government's position *if* the agents had had the authority to enter the premises and thereafter secure the *status quo* while a warrant was obtained. However, it is clear that the Court in *Segura* did not give carte blanche to the Government to do what was done in this case. There, the Supreme Court specifically recognized: "The Court of Appeals affirmed the District Court's holding that there were no exigent circumstances to justify the warrantless entry into petitioners'

apartment. That issue is not before us, and we have no reason to question the courts' holding that that *search* was illegal." *Id.* at 798, 104 S.Ct. at 3382 (emphasis in original). An examination of "that *search*" in *Segura* reveals it to be the type of security check involved here. *See Segura*, 663 F.2d at 413. Thus, the Supreme Court's opinion in *Segura* does not affect the validating requirements for warrantless security checks laid down by the Second Circuit in *Agapito* and the Government's reliance on it is misplaced. *See United States v. Serna*, 625 F.Supp. 548, 554–57 (S.D.N.Y.1985) (using *Agapito* two-pronged test after Supreme Court's decision in *Segura*). *See also United States v. Napue*, 834 F.2d 1311, 1326–27 (7th Cir. 1987) (using *Agapito* test as persuasive authority in examining validity of security check made after Supreme Court's decision in *Segura*). Where agents themselves are responsible for creating a danger that the *status quo* will change they cannot later point to *Segura* and attempt to justify a warrantless entry by claiming the need to preserve the *status quo*.

In sum, the warrantless entry and "security sweep" of the 63rd Road address was illegal because it was not justified by legitimate exigent circumstances.

## IV.

### *Validity of warrant*

The validity of the search warrant now becomes essential to the Government's case. The Court initially notes that even though the affidavit in support of the search warrant contained information derived from the illegal arrest of Sanchez, Reynoso cannot challenge the warrant on that ground as he has no standing to object to the illegal arrest of Sanchez. *See United States v. Tortorello*, 533 F.2d 809, 815 (2d Cir.1976) (since defendant had no standing to contest search of garage, information obtained from search was *not* illegally obtained *as far as defendant was concerned*).

Reynoso challenges the warrant by arguing that its validity was vitiated by inacur-

racies or falsehoods contained in its supporting affidavit. In addition to setting out many other facts and observations, Agent Dolinsky in the affidavit averred:

> On January 4, your deponent was conducting a surveillance of 147–37 Roosevelt Avenue and observed a Hispanic male, who was identified to your deponent as an individual who frequents Apartment 4C and has been identified as Juan Carlos, parked in white Honda outside of the Roosevelt Avenue address.

The Government admits that this statement was not true. At the suppression hearing, Agent Dolinsky testified that he had not personally made the observations attributed to January 4, but had personally surveilled the Roosevelt Address on an earlier date. Dolinsky explained that, since he drafted the affidavit from memory without the benefit of his case file, he had mistakenly reported the January 4 events as personal observations.

Elsewhere in the affidavit Dolinsky also stated that, almost immediately after Sanchez was placed under arrest, Sanchez stated that he had picked up the $75,000 in the yellow shopping bag from the 63rd Road address. At the suppression hearing, however, Dolinsky testified that Sanchez did not make this statement until after the search of the home. Reynoso claims that this discrepancy reveals that the affidavit contained yet another falsehood.

■ Where a defendant can prove, by a preponderance of the evidence, that a false statement in a warrant affidavit was made knowingly and intentionally or with a reckless disregard for the truth, *and* that, with the false material set aside, the affidavit's remaining content is insufficient to establish probable cause, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks v. Delaware,* 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978).

■ However, Reynoso did not make his requisite showing by a preponderance of the evidence, i.e., he did not show that Dolinsky made the false statements know-ingly or intentionally or with a reckless disregard for the truth. The Court credits Dolinsky's testimony that the false statement regarding his personal observations on January 4 was made in error, and believes such error was not reckless given the fact that Dolinsky did not have his case file with him when he drafted the affidavit and that he had indeed made personal observations at the Roosevelt Avenue address several days prior to January 4. Even if Dolinsky's observations, incorrectly attributed to January 4, were excised, there is more than enough remaining information in the affidavit to establish probable cause. Finally, it is clear the Dolinsky affidavit was accurate in stating that almost immediately after his arrest Sanchez said that the $75,000 had been picked up at the 63rd Road address. Since the affidavit was obviously drafted *before* the search of 117–10 63rd Road, Sanchez must have made the statement at the time of his arrest, and Dolinsky's testimony at the suppression hearing to the contrary was erroneous. The warrant was valid.

## V.

### *Items seized after warrant issued: independent source*

■ Certain items sought to be suppressed were found *after* the search warrant was issued. Even though the initial entry of the 63rd Road address was illegal, no taint attaches to the items found after the search warrant was issued as the valid search warrant provides an "independent source" for their discovery. Where the information upon which a valid warrant is secured is not derived from the illegal entry of premises, the evidence seized in execution of such a warrant should not be suppressed—the warrant is considered a means of discovery sufficiently independent from the illegal entry to purge the evidence of any taint derived from the illegal entry. *Segura v. United States,* 468 U.S. at 813–16, 104 S.Ct. at 3389–91. Here, since no information derived from the illegal entry and security sweep was included in Agent Dolinsky's affidavit in support

of the warrant, the independent source exception to the exclusionary rule applies and the items seized after the warrant was issued may be introduced against Reynoso at trial.

## VI.

### *Items found before warrant issued: inevitable (re)discovery*

The remaining physical evidence sought to be suppressed was found *after* the illegal entry of the 63rd Road address but *before* the search warrant was issued. Because the warrant was valid, there is authority for upholding the admissibility of the pre-warrant evidence found in plain view during the security sweep. That authority is *not* the "plain view" doctrine. For this doctrine to apply, there must be a valid, antecedent reason for the law enforcement officer's presence at the place where the evidence or contraband is in plain view. *Coolidge v. New Hampshire*, 403 U.S. 443 at 467, 91 S.Ct. 2022 at 2038, 29 L.Ed.2d 564 (1971). Here, the agents had no right to be in the home before the warrant was issued.

The authority that upholds the discovery of the pre-warrant evidence in this case is the "inevitable discovery" doctrine. Where a search warrant is neither sought because of, nor supported by, information derived from an illegal entry, the evidence found during that illegal entry is admissible where such evidence inevitably would have been discovered during the execution of a valid search warrant. *Murray v. United States*, —— U.S. ——, 108 S.Ct. 2529, 2535–36, 101 L.Ed.2d 472 (1988). In this case, even though the agents' entry and security sweep was illegal *ab initio*, the items discovered during the illegal security sweep are nevertheless admissible because they inevitably would have been discovered when the valid warrant was executed since they were either out in the open in one of the rooms or were in plain view once the closet doors were opened. *See Id. See also United States v. Whitehorn*, 829 F.2d 1225, 1231 (2d Cir.1987) (evidence found prior to issuance of valid search warrant should not be suppressed where such

evidence would have been found during execution of warrant), *cert. denied*, —— U.S. ——, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988); *United States v. Matos–Peralta*, 691 F.Supp. 780, 787 (S.D.N.Y.1988) (same). *But see Murray v. United States*, 108 S.Ct. at 2536 *et seq.* (Marshall, Stevens, & O'Connor, JJ., dissenting) ("inevitable *re* discovery" exception to exclusionary rule emasculates warrant requirement of Fourth Amendment). The items found before the search warrant was issued are therefore admissible against Reynoso at trial.

## VII.

### *Reynoso's post-arrest statements*

Finally, Reynoso claims that he did not knowingly and voluntarily waive his right to remain silent, and that his post-arrest statements should be suppressed. The evidence at the suppression hearing showed that Reynoso was twice informed of his *Miranda* rights in English: once at the 63rd Road address by Agent Birnstill, and again at DEA headquarters by Agent Dolinsky before any interrogation began. Both times Reynoso indicated that he understood his rights, and had previously indicated, by engaging in conversation with the agents, that he understood English. In light of this evidence, the Court finds that Reynoso made a knowing and voluntary waiver of his rights before making the statements sought to be suppressed here. The statements are therefore admissible.

## CONCLUSION

As to the defendant Jaime Sanchez, the facts in this case were too tenuous to provide a "reasonable suspicion" of illegal activity to justify an investigatory stop. Moreover, given the totality of circumstances surrounding the stop of the automobile, the so-called "investigatory stop" was actually an arrest for which probable cause was not established. Sanchez's suppression motion is therefore GRANTED.

As to the defendant Augusto Reynoso–Nunez, although the initial entry of his home was illegal, the items found there are

admissible at trial against Reynoso because this evidence was either discovered after a valid search warrant was issued or was discovered before the search warrant was issued but inevitably would have been discovered when the warrant was executed. In addition, Reynoso's post-arrest statements are admissible because they were made after a knowing and voluntary waiver of his rights. Accordingly, Reynoso's suppression motion is DENIED.

SO ORDERED.