UNITED STATES of America

v.

Jose GORDILS a/k/a "Flacco," Nicholas Mpounas, a/k/a "Nick Bounas," Francisco Bastar, a/k/a "Kako," and Gregory Melendez, Defendants.

No. S 89 Cr. 395 (DNE).

United States District Court, S.D. New York.

Nov. 20, 1989.

Otto G. Obermaier, U.S. Atty., N.Y. (Alexandra Rebay, Asst. U.S. Atty., of counsel), for U.S.

Goldberger & Dubin, P.C., New York City (Lawrence Dubin, of counsel), for defendant Gordils.

## OPINION AND ORDER

EDELSTEIN, District Judge:

On November 1 and November 3, 1989 this court held an evidentiary hearing on defendant Gordils' motion to suppress evidence seized from 636 East 224th Street, Apartment 1A, Bronx, New York on May 15, 1989. The court reserved opinion and directed the parties to file proposed findings of fact and conclusions of law on November 13, 1989. This opinion incorporates the court's formal findings of fact and conclusions of law on the suppression issue.

At issue in the instant suppression motion are certain items seized from Apartment 1A during two separate searches conducted on May 15, 1989. There was no warrant to enter the apartment during the initial entry, but the Government contends that exigent circumstances justified the search. Upon this entry of the apartment, certain items in plain view which were obviously incriminating were seized at that time. After the agents were inside the apartment and seized the items in plain view, they then sought a telephonic search warrant. The warrant was not based on any evidence seized during the warrantless entry. After obtaining the warrant, the agents recovered additional items from the apartment.

Defendant Gordils argues that the agents who conducted the investigation, the initial search and the arrests had ample opportunity to seek a warrant prior to the entry of the apartment. Defendant further avers that the entry was not based upon exigent circumstances but rather that the exigent circumstances were created by the agents themselves in their failure to earlier seek a warrant. According to the defendant, the evidence seized pursuant to the warrantless search was illegally seized and should be suppressed.

For the reasons stated below, defendant's motion to suppress the evidence seized is denied.

## BACKGROUND

The defendant Gordils was arrested on May 15, 1989 at approximately 5:00 p.m. in the vicinity of 97th Street and Riverside Drive in Manhattan. The events leading up to the arrest are as follows. In early May 1989 defendant, Francisco Bastar, met with Luis Hernandez, the confidential informant for the DEA, and discussed providing narcotics to Hernandez through Bastar's "connection". A few days later, on May 10, Bastar brought Hernandez to Apartment 1A where Hernandez was introduced to defendant Gordils. Defendants Nicholas Mpounas and Gregory Melendez were also in the apartment at that time, as well as an individual known to Hernandez as "Piki" and two Dominican males Hernandez did not know.

Inside the bedroom of the apartment, Gordils and Bastar showed Hernandez approximately 1½ kilograms of cocaine. On that same date, Gordils and Bastar indicated that there were guns inside the apartment. Later, Hernandez notified Special Agent Johnson that the four defendants were inside the apartment with approximately 1½ kilograms of cocaine. Johnson instructed Hernandez that because it was late, the deal should be set up for the following day.

On May 11, 1989, in two recorded telephone conversations, Hernandez arranged to meet with Bastar later that day. Bastar brought Hernandez back to Apartment 1A where the four defendants were present, in addition to the individual known as "Piki." Hernandez observed only approximately a half kilogram of cocaine in the apartment and was told by Gordils that two additional kilograms would be delivered by a driver. Hernandez contacted Special Agent Johnson and advised him that the two kilograms had not yet arrived. Agent Johnson instructed him that if the cocaine did not arrive by 6:00 p.m. the deal should be postponed to a later date. The two kilograms did not arrive before 6:00 p.m. and the deal

was postponed. Before leaving the apartment, the informant was provided with a sample of the narcotics by Gordils.

On May 15, 1989, Bastar arranged to meet Hernandez that afternoon. Prior to going to the apartment, Hernandez conferred with Agent Johnson, who instructed him to arrange for the deal to take place in the vicinity of 97th and Riverside Drive in Manhattan. Hernandez met Bastar at 161st Street in the Bronx and then accompanied Bastar to Apartment 1A at approximately 3:00 p.m. Hernandez saw Gordils, Mpounas and Melendez as well as another individual who had come to the apartment to purchase one kilogram of cocaine from Gordils. Hernandez observed approximately 2½ kilograms of cocaine in the bedroom and what appeared to be several thousand dollars in cash.

When Hernandez briefly left the apartment, he telephoned Agent Johnson and told him that there were 2½ kilograms of cocaine in the apartment. Johnson advised Hernandez that he needed more time and instructed Hernandez to delay his departure so that surveillance could be set up in the area of 97th and Riverside Drive.

Hernandez again spoke to Agent Johnson at approximately 4:00 p.m. and reported that he and Gordils would be leaving the apartment, that the defendants had the two kilograms plus another half kilogram and that Gordils would be bringing at least one of the two kilograms of cocaine. Hernandez told Johnson that he did not know if Gordils would be carrying any weapons but that there were weapons in the apartment.

Gordils left the apartment and instructed Bastar to remain and not open the door for anyone except Mpounas, Melendez or "Piki." Gordils told Hernandez that after the deal he would return to the apartment with the money received from the sale of the cocaine. Hernandez was unable to communicate this information to Special Agent Johnson until after the arrest of Gordils. Hernandez and Gordils then proceeded to 97th and Riverside Drive in Hernandez' car with the two kilograms of cocaine on the floor of the passenger side of the vehicle.

After arriving in the vicinity of 97th Street and Riverside Drive, at approximately 5:00 p.m., Hernandez left Gordils in the car and met with Special Agent Laboy in Laboy's car. Hernandez advised Agent Laboy that Gordils had brought the two kilograms and that Gordils and the cocaine were in Hernandez' car. Agent Laboy then signalled over the radio to arrest Gordils.

Agent Johnson arrested Gordils and seized the two kilograms of cocaine from the floor of the car. Following the arrest, the agents and Hernandez proceeded to the DEA office where Hernandez advised Agent Johnson that (1) he and Gordils had left apartment 1A where the additional ½ kilogram remained; (2) Bastar remained in the apartment; (3) Hernandez had been advised that there were weapons in the apartment; (4) Gordils had ordered an additional kilogram of cocaine for another individual who had sought to purchase cocaine from Gordils while Hernandez was in the apartment; (5) the other defendants were remaining in the apartment awaiting Gordils' return with the money; (6) Gordils had instructed Bastar not to open the door for anyone other than Mpounas, Melendez or "Piki" until Gordils returned.[1]

Based upon the information provided by Hernandez, the agents decided to secure apartment 1A and prevent any people in the apartment from fleeing or destroying evidence and to seek a search warrant once the premises were secured. Special Agent Johnson and five other agents proceeded to the apartment. The agents did not obtain a warrant because time was of the essence in preventing the flight of suspects or the destruction of evidence.

---

1. Although Agent Johnson was aware of some of this information prior to the arrest of Gordils, he was not aware of a number of these items which Hernandez had been unable to communicate to him after their last conversation at approximately 4:00 p.m. Specifically, Johnson was unaware of the information regarding Bastar remaining in the apartment, the likelihood of other suspects joining him and further, that the suspects would be awaiting Gordils' return to count the money.

The agents reached the apartment at approximately 6:30 p.m. Hernandez, who was in the car with Special Agents Johnson and Laboy, spotted defendant Melendez standing on the corner of 224th Street and White Plains Road and defendant Mpounas standing in front of 636 East 224th Street. Hernandez identified each of them as being involved in the drug transaction with Gordils. Hernandez did not see Bastar or Piki on the street. Mpounas was arrested on the street and Melendez was arrested in the vestibule of the building. At the time of the arrests, the agents did not know whether any allies of Gordils or other individuals may have observed the arrests and apprised those individuals inside of Apartment 1A.

Hernandez then directed the agents to the apartment. Special Agent Levine knocked on the outside door and announced in English as well as Spanish "Police! Open up!" to which no one responded. Special Agent Timothy Corley who was standing next to the door heard some shuffling inside the apartment. The agents then forced their way inside the apartment.

Inside the apartment, Bastar, who was seated in the living room, was arrested. On the floor next to Bastar was a fully loaded 9 millimeter semi-automatic pistol in plain view. After arresting Bastar and seizing the gun, the agents conducted a security sweep to see if any individuals were hiding in the apartment. The agents looked in closets and in areas where a person might reasonably be found. Approximately one kilogram of cocaine was in plain view on a table in the bedroom. Agent Johnson seized it. Also in plain view was a scale and additional white powder in the bedroom and a plastic grinder, glassine envelopes and powder residue in the living room. In the bedroom closet was an amount of United States currency. None of these items were seized at this time.

After bringing Mpounas and Melendez to the apartment, Agent Laboy used the telephone in the apartment next door and called the United States Attorney's Office for the Southern District of New York.

Agent Laboy provided information about the apartment and the arrests that day so that a search warrant could be obtained for the apartment premises.

Special Agents Johnson and Laboy left the apartment and returned to the DEA office with Mpounas, Melendez and Bastar. Special Agent Johnson took with him the pistol found in plain view on the living room floor, the kilogram of cocaine found on the bedroom table and other items seized pursuant to Mpounas's arrest. The remaining items observed in the apartment were not removed at that time. Three agents remained in the apartment until a search warrant could be obtained. While they waited, the agents did not search the apartment.

Upon returning to DEA headquarters, Special Agent Laboy proceeded to the United States Attorney's Office. Laboy described the events of that afternoon, the information which Hernandez supplied regarding the apartment, the drugs seen in the apartment by Hernandez and the statements indicating that there were weapons in the apartment. He also informed the Assistant United States Attorney of the arrests made and that a gun and a kilogram of cocaine were found in plain view in the apartment and seized by the agents. Based upon this information, the Assistant prepared an affidavit. Magistrate Bernikow was called and a telephonic warrant was issued at approximately 9:36 p.m. based upon his finding of probable cause. The affidavit did not state that a gun and kilogram of cocaine were found in the apartment.

The agents remaining at the apartment were contacted and advised that a search warrant had issued. The agents then executed the warrant at approximately 10:00 p.m. that evening. The agents found and seized additional narcotics, narcotics paraphernalia, firearms and other items not in plain view during the initial search. They also seized those items found during the initial search. All the items were brought back to the DEA office and given to Special Agent Johnson for processing.

## DISCUSSION

The issues requiring resolution by the court include: 1) whether the initial search of the apartment was conducted pursuant to the exigent circumstances exception to the warrant requirement; 2) whether the evidence seized by the agents before the warrant was obtained should be suppressed; 3) whether it was proper for the agents to seize certain items in plain view during this initial search; 4) whether the items seized during the execution of the search warrant were lawfully seized and 5) if the evidence in plain view during the initial search was seized pursuant to unlawful police activity, should it nonetheless be admitted under the inevitable discovery rule.

### I. Exigent Circumstances

It is fundamental that warrantless searches and seizures are unreasonable under the Fourth Amendment unless they fall within one of the well delineated exceptions to the warrant requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973); *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The Government argues that the original warrantless entry into the apartment to prevent the destruction of evidence and escape of suspects was justified by the exigent circumstances exception to the Fourth Amendment.

■ The factors to be considered in determining whether exigent circumstances permitted a warrantless entry into a person's home include: (1) the gravity of the crime; (2) the likelihood that the suspects were armed; (3) whether there was a clear showing of probable cause to believe that a crime had been committed; (4) whether there was a strong reason to believe the suspects would be found in the premises; (5) the likelihood that the suspects would escape or that evidence would be destroyed; and (6) the peaceful circumstances of the entry. *United States v. Reed,* 572 F.2d 412, 424 (2d Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978); *accord United States v. Cattouse,* 846 F.2d 144, 146 (2d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 316, 102 L.Ed.2d 335 (1988). This list is of course illustrative and other factors may be relevant. *United States v. Martinez–Gonzalez,* 686 F.2d 93, 100 (2d Cir.1982). A determination of exigent circumstances rests upon whether the facts in a particular case dictate an urgent need, justifying a warrantless entry. *Id.* at 100.

■ In applying these standards to the entry here, it is clear that exigent circumstances were present. Only after the arrest of Gordils did the agents learn that there was at least one individual still inside the apartment. The testimony of the confidential informant indicates that the agents were aware before the arrest of Gordils that there was an additional half kilogram of cocaine in the apartment but they did not know that Bastar was in the apartment awaiting the arrival of Melendez, Mpounas and/or Piki. Moreover, the individuals in the apartment expected the imminent return of Gordils and would be wary if he failed to return promptly. Awaiting Gordils' return, they would be likely to flee and/or remove or destroy narcotics should they become suspicious. After the agents arrived on the scene and arrested Mpounas and Melendez, because Bastar was presumably remaining in the apartment and the whereabouts of Piki were unknown it was reasonable for the agents to believe that there was at least one individual remaining in the apartment.

In the instant circumstances, the gravity of the crime, the knowledge of the agents that the suspects were armed, the clear showing of probable cause that a crime had been committed coupled with the strong likelihood that the premises were occupied and that the suspects would be likely to escape or destroy evidence dictate a finding of exigent circumstances. An immediate need existed to secure the apartment in order to prevent flight of suspects or the destruction of evidence.

Further, once the agents had knocked, announced "police" and ordered that the door be opened, they heard scuffling noises and no one attempted to open the door.

These actions confirmed the presence of someone in the apartment and the possibility of destruction of evidence. Under the circumstances a peaceful entry was not practical and the agents were justified in entering the apartment by force.

The Second Circuit has also upheld a warrantless entry into an apartment to prevent the destruction of evidence following an arrest outside the building where the arrest was made and the arrest might have been observed by someone who may have alerted the occupants of the apartment, *United States v. Vasquez*, 638 F.2d 507, 529–32 (2d Cir.1980), and the prerequisites for such an entry were present here. To justify a warrantless entry, the court in *United States v. Agapito*, 620 F.2d 324 (2d Cir.), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980), stated that the arresting officers must have (1) a reasonable belief that third persons are inside and (2) a reasonable belief that third persons are aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public.

In the instant case, the factors set forth in *Agapito* are satisfied. The officers had been told by Hernandez that there would be one or more individuals awaiting Gordils' return with the money from the transaction. That Defendant Bastar as well as the individual known as Piki were not outside the building support a reasonable belief that other persons were inside the apartment. Because the defendants had been awaiting the return of Gordils with the money it is possible that one or more individual in the apartment might have come to the vestibule of the building and observed the arrests. Further, it was reasonable for the agents to believe that someone in the building may have informed the individuals in Apartment 1A of the arrests of Mpounas or Melendez outside. Accordingly, it was reasonable for the agents to believe that evidence might be destroyed or that individuals might escape. Therefore, the warrantless entry was justified under the exigent circumstances exception to the warrant requirement specified in *Agapito*

as well as that of *United States v. Reed, supra.*

II. Whether the Evidence Obtained Pursuant to the Entry Made Under Exigent Circumstances Should Be Suppressed Because the Agents Had Prior Opportunity to Seek a Search Warrant

■ The failure of the agents to seek a search warrant at the first indication of probable cause did not preclude them from acting on the exigency which arose after Gordils' arrest. Although it is likely that the agents could have obtained a warrant well before the evening of May 15, 1989, they were not required to do so. The Second Circuit has made it perfectly clear that narcotics agents are not required to seek a warrant upon an initial finding of probable cause. Failure by agents to obtain a warrant at the first opportunity does not preclude them from acting on an exigency that arises later. *United States v. Cattouse*, 846 F.2d 144, 147 (2d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 316, 102 L.Ed.2d 335 (1988). Due to the nature of exigent circumstances, "the exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action." *Cardwell v. Lewis*, 417 U.S. 583, 595–96, 94 S.Ct. 2464, 2472, 41 L.Ed.2d 325 (1974). Investigative practices of police officers would be unreasonably thwarted if law enforcement agents were required to seek a warrant at a time when sufficient probable cause existed, but before a full investigation was held. Decisive evidence of criminal activity might be foregone with such a stringent rule. Accordingly, although probable cause existed for some time the agents were not required to seek a warrant but were entitled to continue their investigations to gather further evidence.

At the suppression hearing, Gordils argued that the agents "created" the exigency by planning to have the deal with Gordils occur at 97th and Riverside Drive rather than in the vicinity of East 224th Street and that the agents were therefore not justified in entering the apartment under the exigent circumstances exception. A re-

cent Second Circuit case provides that as long as the agents act in good faith, the fact that their activities contribute to the likelihood that evidence would be destroyed does not detract from justification of a warrantless entry. *United States v. Zabare,* 871 F.2d 282, 290–91 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989); *accord United States v. Cattouse, supra,* 846 F.2d at 148.

For security reasons, the agents decided that the transaction with Gordils would take place in an area where they would be able not only to establish surveillance and detect any countersurveillance by Gordils' confederates, but also to provide protection to Hernandez and Special Agent Laboy. The location selected satisfied these criteria. This decision was appropriate and no evidence adduced at the suppression hearing suggests that this decision was made for the improper purpose of creating exigent circumstances. Rather, the evidence advanced at the hearing supports a finding of good faith in choosing the location for the deal with Gordils.

Only after the arrest of Gordils was Agent Johnson able to learn that Bastar was awaiting the arrival of other suspects and that these individuals were awaiting Gordils return. After the arrest of Gordils, the agents had no way of ascertaining how many individuals remained in the apartment and whether there was surveillance set up in the vicinity of the apartment. Based upon these facts, the agents were fully justified in entering the apartment without a warrant.

### III. Items Seized in Plain View During the Initial Search

█ Upon entering the apartment, the agents were fully within the law to conduct a security sweep limited to those areas where a person might conceivably be hiding to protect themselves and to prevent the destruction of evidence. *See e.g. Payton v. United States,* 445 U.S. 573, 589, 100 S.Ct. 1371, 1381, 63 L.Ed.2d 639 (1980); *United States v. Escobar,* 805 F.2d 68, 71 (2d Cir.1986); *United States v. Agapito,* 620 F.2d 324, 335 (2d Cir.), *cert. denied,*

449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980).

Contraband in plain view may be seized during a security sweep. *See Coolidge v. New Hampshire,* 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564 (1971); *United States v. Grubczak,* 793 F.2d 458, 461 (2d Cir.1986); *United States v. Manley,* 632 F.2d 978, 986–87 (2d Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981). The 9 millimeter pistol and the kilogram of cocaine were in plain view and obviously incriminating. Accordingly, these items were properly seized.

### IV. The Evidence Seized During the Execution of the Search Warrant

After entering the apartment under the exigent circumstances exception and seizing some of the incriminating items found in plain view, the agents sought a telephonic search warrant for narcotics, paraphernalia and firearms, among other items. The affidavit sworn by Agent Laboy in support of the application for the warrant did not rely upon the pistol, the kilogram of cocaine or any items found in plain view during the initial search of the apartment. Probable cause for the issuance of the warrant was established from facts independent of the evidence observed during the initial warrantless entry.

█ The affidavit demonstrated probable cause based on facts known to the agents prior to the initial entry. Magistrate Bernikow properly found probable cause for the issuance of a warrant from the facts supplied. Where a court can conclude from the search warrant affidavit that probable cause for the search existed independent of any evidence tainted by the illegal search, the search remains valid. *United States v. Whitehorn,* 829 F.2d 1225, 1231 (2d Cir.1987). Magistrate Bernikow considered the application for a warrant and granted it without having before him any evidence obtained from the initial warrantless search. Accordingly, the search was a valid one and the evidence seized during the execution of the valid

search warrant was properly seized and should not be suppressed.

## V. Inevitable Discovery

■ Although the initial warrantless entry was authorized pursuant to the exigent circumstances exception to the warrant requirement, the doctrine of inevitable discovery should also be addressed. The items seized in plain view during the warrantless entry would ultimately have been discovered during the execution of the warrant which was obtained without reliance on evidence obtained during the initial entry. Although exigent circumstances permitted the original search, assuming *arguendo* that exigent circumstances did not exist, the doctrine of inevitable discovery provides for the admission of the evidence found during the initial search.

The Supreme Court has held that evidence initially discovered by unlawful means is admissible when the prosecution can establish by a preponderance of the evidence that the evidence would have been inevitably discovered by lawful means. *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984). The Court extended the independent source doctrine which allows admission of evidence that has been discovered by means wholly independent of any constitutional violation. The rationale for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct is that notwithstanding the value of deterring police from constitutional violations, there is a great societal cost in not admitting highly probative evidence. The proper balance is struck by putting police in the same, but not a worse, position than they would be in if the unlawful conduct had not occurred.

In *Nix*, the Court found that evidence concerning the location and condition of the body of a ten year old girl whom the defendant had murdered could be introduced even though the police were led to her body through admissions elicited during an unlawful interrogation. The Court commented that the body would have been discovered without the defendant's admissions because a search had been in progress at the time of the admission and the search party was close to finding the body.

The Second Circuit later discussed the rationale underlying *Nix*, stating that both the independent source and inevitable discovery exceptions were designed to ensure the interests of society in deterring unlawful police action and the public interest in a jury receiving all probative evidence of a crime. *United States v. Whitehorn*, 829 F.2d 1225, 1230–31 (2d Cir.1987). In the instant case, these competing interests are balanced by placing the police in the *same*, but not a worse, position than they would be in if the original unwarranted search had not occurred. Thus, in balancing the competing interests, as long as the evidence would have inevitably been discovered, it is inappropriate to suppress the evidence. *Id.* at 1231; *Nix*, 467 U.S. at 443, 104 S.Ct. at 2508–09.

In the instant case, the Government has established by a preponderance of the evidence that the items seized from Apartment 1A during the unwarranted search would ultimately have been discovered during the execution of the later search. As noted above, the affidavit in support of the warrant did not rely on any evidence obtained during the previous entry. Moreover, if the agents had not made a determination that there was an immediate need to secure the premises, they would have obtained a telephonic warrant at the earliest possible time. Therefore, if the initial warrantless entry had not occurred, there would have been a warranted entry as soon as a warrant could have been obtained. *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 2536, 101 L.Ed.2d 472 (1988).

Accordingly, because the evidence would have ultimately been found by the agents, whether or not the initial entry was justified by exigent circumstances, the evidence seized during the unwarranted search is clearly admissible.

## CONCLUSION

The initial search was conducted pursuant to exigent circumstances. The evi-

dence in plain view which was seized during the initial entry is admissible. The items seized during the execution of the search warrant were lawfully seized. Pursuant to the inevitable discovery rule, the evidence initially seized would have been found during the execution of the search warrant and would be admissible regardless of whether exigent circumstances permitted the initial entry. Defendant's motion to suppress is denied in all respects. Accordingly, all evidence seized during both searches on May 15, 1989 is admissible.

SO ORDERED.