**UNITED STATES of America, Appellee,**

v.

**Hugo LOPEZ, Juan Trujillo and Hernando Vasquez, Defendants–Appellants.**

**Nos. 340, 258 and 244, Dockets 90–1210, 90–1211 and 90–1212.**

United States Court of Appeals, Second Circuit.

Argued March 6, 1991.

Decided June 17, 1991.

---

Miguel A. Estrada, Asst. U.S. Atty., S.D. N.Y. (Otto G. Obermaier, U.S. Atty. and Debra Ann Livingston, Asst. U.S. Atty., S.D.N.Y., of counsel), for appellee.

Joaquin Perez (Charles G. White, Miami, Fla. and Leonard J. Levenson, New York City, of counsel), for defendant-appellant Lopez.

Michael A. Marinaccio, Culleton & Marinaccio, New York City, for defendant-appellant Trujillo.

Abraham L. Clott, New York City, Legal Aid Soc., for defendant-appellant Vasquez.

Before KEARSE, PRATT and McLAUGHLIN, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Hugo Lopez, Juan Trujillo, and Hernando Vasquez appeal from judgments of conviction on one count of conspiracy to distribute more than five kilograms of cocaine (21 U.S.C. § 846) and one count of possession with intent to distribute more than 500 grams of cocaine (21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2) entered against them in the United States District Court for the Southern District of New York, Robert P. Patterson, Jr., *Judge*. For the reasons that follow, we affirm.

## BACKGROUND

In April of 1989, Richard Boisvert, who had previously worked as a confidential informant for the Drug Enforcement Administration ("DEA"), was living in Miami. His niece Cathy Betancourt, a young woman of fifteen, was dating defendant Hugo Lopez, and she introduced Lopez to Boisvert. Over the next few weeks, the two men socialized. Lopez lived with his mother, and according to Boisvert, on one occasion Lopez took him to her house and showed him a crate that Lopez said contained between 100 and 150 kilograms of cocaine.

Boisvert testified that approximately two weeks later, Lopez asked him if he would be willing to help sell 50 kilograms of cocaine in New York City. Lopez explained that while he and Boisvert would sell the cocaine, people that he knew at a local flower shop would deliver the cocaine to New York City. Later that day, Lopez introduced Boisvert to Juan Trujillo and told Boisvert that Trujillo would be helping them sell the cocaine. After leaving Lopez and Trujillo, Boisvert telephoned DEA agent Edward Oberti in New York and informed him of Lopez's plan.

On June 6, 1989, the three men and Betancourt drove to Ed's Flower Shop. During the car ride, Lopez and Trujillo spoke in Spanish about Trujillo's fee. Boisvert did not speak Spanish, so Betancourt translated this conversation for him. Upon arriving at the flower shop, Lopez and Betancourt went inside, and when they returned twenty minutes later, Lopez told Boisvert and Trujillo that the arrangements to have the cocaine delivered to New York City had been finalized.

After leaving the flower shop, Lopez, Trujillo, Betancourt, and Boisvert went to a travel agency, where they purchased four airplane tickets for a flight to New York City that was leaving later that day. Lopez paid for the tickets with his mother's American Express card.

Arriving at LaGuardia Airport at approximately 11:00 p.m., Lopez rented a car and the three men and Betancourt drove into Manhattan, where they checked into the Chatwal Inn on 55th Street and Broadway. Both the car rental and the hotel room were paid for by Lopez, who again used his mother's American Express card.

The next day, Boisvert and Lopez went to the Days Inn hotel, which was about four blocks from the Chatwal Inn, and there they met Agent Oberti, who was posing as the purchaser of the cocaine. Lopez and Oberti agreed upon a price of $18,500 per kilogram for the cocaine, and Lopez then asked Oberti for the price of one kilogram as a deposit. When Oberti rejected this proposal, Lopez questioned whether Oberti had the money to complete the deal. Faced with this challenge, Oberti showed Lopez a gym bag that contained $214,000 and told Lopez that the rest of the money was back in his hotel room. Without resolving the issue of the deposit, Lopez left the hotel and told Oberti he would contact him later.

The three men next met at 6:30 p.m., and Lopez repeated his request for a deposit. When Oberti still refused, Lopez stated that he would have to check with his "partner", who was in the process of transporting the cocaine, to see if the deal could still be done.

A third meeting was held at approximately 8:00 p.m., and Lopez expressed frustration that the deal had not yet been completed. He assured Oberti that the cocaine was available and that the transaction could be completed the next day. He offered to lower the price of the cocaine to $18,250 a kilogram; Oberti acceded to this,

and the two men agreed to complete the deal the next day.

The following day, Lopez, Betancourt, Trujillo, Boisvert, and Oberti met at the Chatwal Inn. Leaving Betancourt and Trujillo behind, Lopez, Boisvert, and Oberti went to the nearby Marriott hotel to meet Lopez's partner. Lopez and Boisvert told Oberti to wait in the lobby, while they went to get Lopez's partner. A short time later the two men returned and told Oberti that Lopez's partner would meet them shortly at a local restaurant.

Lopez, Boisvert, and Oberti then walked to the restaurant, where they were soon joined by "Ed", who was later identified as "Juan Carlos", Carlos's wife, and Hernando Vasquez. Oberti and Carlos agreed that Boisvert would come to Carlos's room at the Marriott later that day, and there he would receive a kilogram sample of the cocaine to give to Oberti to examine.

Lopez, Boisvert, and Oberti went to the Marriott at 2:00 p.m. They were met there by DEA undercover agent Michael Grabowski, who was posing as Oberti's partner. Boisvert then went to Carlos's room, but returned a short time later without the cocaine. He explained that Carlos did not want to complete the drug deal at that time, because he believed that there were too many police officers in the area. The three men left the Marriott.

Later that day, DEA agents went to Lopez's room at the Chatwal Inn and, after announcing that they were federal agents, used a ram to break down the room's door. They did this without a warrant. They arrested Lopez, Vasquez, and Trujillo. The agents also recovered approximately one kilogram of 93% pure cocaine that had been thrown out of Lopez's hotel window when the agents entered the hotel room. Vasquez and Lopez made incriminating statements: Vasquez admitted that he was hired by Carlos to deliver the cocaine, and Lopez confessed that he had engaged in negotiations to sell 50 kilograms of cocaine.

Lopez, Trujillo, and Vasquez were charged with one count of conspiring to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846, and with one count of possessing with intent to distribute more than 500 grams of cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B), and 18 U.S.C. § 2.

At trial, Lopez called his mother to testify. Mrs. Lopez stated that her son sometimes lied to exaggerate his own importance. Lopez himself also testified. He claimed that Boisvert and Betancourt had approached him about putting together a drug deal, and that under pressure from them, he contacted Carlos. He stated that he had obtained only one kilogram of cocaine from Carlos, that he never possessed more than that one kilogram, and that he had not told the DEA agents that he had attempted to sell 50 kilograms of cocaine. The other defendants did not call any witnesses, nor did they testify.

On December 7, 1989 the jury convicted the three defendants on both counts of the indictment. On March 14, 1990, the district court sentenced Lopez and Vasquez to prison terms of 18 years, followed by five-year terms of supervised release. Trujillo was sentenced to a 14-year prison sentence, followed by a five-year term of supervised release.

## DISCUSSION

On appeal, the defendants raise a number of issues, which for convenience and clarity will be divided into five sections: (1) the district court's determination at a suppression hearing that the cocaine was legally seized; (2) an evidentiary ruling by the district court; (3) the mention by the prosecutor of prior criminal activity during his summation; (4) the district court's jury charge; (5) the sentences imposed by the district court.

### A. *The Seizure of the Cocaine.*

Prior to trial, the three defendants moved to suppress the cocaine, claiming that it had been illegally seized. In addition, Lopez and Vasquez argued that their statements also should be suppressed, since they were made as a result of the warrantless entry. The government ar-

gued that exigent circumstances permitted them to enter the hotel room.

At a suppression hearing held on September 11 and 12, 1989, DEA supervisor and Special Agent Gloria Woods testified that on the afternoon that the transaction was to be completed, Lopez had appeared at the Days Inn lobby unexpectedly and that she believed that he had seen agent Grabowski talking to other DEA agents. Lopez made no mention of this as he spoke to Oberti and Grabowski. Lopez indicated that the cocaine had not arrived and, after discussing the problems with the delivery of the cocaine with them, he immediately left the Days Inn, walking. Oberti then received word from Boisvert that the cocaine had in fact arrived and that Boisvert thought that Lopez was aware of that fact. Grabowski relayed this information to Woods. Woods, who along with other agents was following Lopez, testified that soon after Lopez left the Days Inn, he started to run towards the Chatwal Inn, looking around and behind him. He also attempted to make a phone call from a pay phone outside the Chatwal Inn, but finding the phone in use, ran into the hotel. Concluding that Lopez had discovered either that he was being followed or that Oberti and Grabowski were undercover agents, Woods and seven other DEA agents immediately went, without a warrant, to Lopez's room at the Chatwal Inn. They knocked on the door, announced that they were federal agents, and then used a ram to break down the door. As they entered the room, they saw Lopez throw a package out the window. That package, which was recovered by other agents on the street, contained one kilogram of cocaine.

The district court credited Woods' testimony, and concluded that the government "carried its burden of establishing the lawfulness of the entry." For this reason, the district court refused to suppress the physical evidence and the incriminating statements made by Lopez and Trujillo. We conclude that the district court's conclusion was not clearly erroneous.

▉ "A district court's determination as to whether exigent circumstances exist-ed is fact-specific, and will not be reversed unless clearly erroneous." *United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir. 1990) (in banc), *cert. denied,* —— U.S. ——, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991). In determining whether exigent circumstances support a warrantless entry, we have stated that the test for such a determination "is an objective one that turns on the district court's examination of the totality of circumstances confronting law enforcement agents in the particular case." *Id.* (citations omitted). We have also suggested an "illustrative" list of factors that aid in determining whether exigent circumstances exist at the time of the arrest:

(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause * * * to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*United States v. Cattouse,* 846 F.2d 144, 146 (2d Cir.), *cert. denied,* 488 U.S. 929, 109 S.Ct. 316, 102 L.Ed.2d 335 (1988) (citations omitted). In determining that exigent circumstances existed to justify the warrantless entry in this case, the district court concluded:

The totality of the circumstances confronting the arresting agents in this case establish that the decision to enter Room 304 [Lopez's room] without a warrant was objectively reasonable. The arresting agents were faced with a situation where they knew that (1) one kilo of cocaine had been delivered to Room 304, (2) Lopez had made an unexpected visit to the Days Inn, (3) Lopez had seen one of their undercover officers sitting with surveillance agents in the Days Inn lounge, (4) Lopez knew that a delivery of cocaine had been made to Room 304 or was imminent, (5) Lopez had broken into a run as he travelled between the Days Inn and the Chatwal Inn, (6) Lopez had

looked about furtively as he ran, and (7) Lopez had attempted to make a telephone call outside the Chatwal Inn and then ran inside.

In their attempt to counter these findings, all of which strongly suggest exigent circumstances that support a warrantless entry, Lopez and Trujillo argue that the agents had an opportunity to obtain a warrant before entering the hotel room, and that this failure negates any basis for the exigent circumstances exception to the warrant requirement of the fourth amendment. In addition, at oral argument Trujilo's attorney asserted that the DEA agents themselves created the exigent circumstances upon which they then relied to support their warrantless entry. We reject both of these arguments.

While Lopez and Trujillo concede that the agents had probable cause to obtain a warrant, they nevertheless argue that without evidence of either violence on their part or the likelihood that they would escape, the agents were required to obtain a warrant. Their contention is directly countered by the district court's factual finding that "there was some likelihood that the defendants would escape, and a virtual certainty that the evidence would be destroyed and coconspirators notified, if the time were taken to obtain a warrant." In light of agent Woods' testimony, the district court's finding was not clearly erroneous. Accordingly, there was sufficient evidence to conclude that "there was [an] 'urgent need' that 'justif[ied]' the warrantless entry." *United States v. Crespo*, 834 F.2d 267, 270 (2d Cir.1987) (quotation omitted), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988).

■ Furthermore, contrary to the suggestion of Lopez and Trujillo, the fourth amendment does not require government agents to obtain a warrant at the earliest possible moment; instead, they may wait "until events have 'proceeded to a point where the agents could be reasonably certain that the evidence would ultimately support a conviction'". *United States v. Miles*, 889 F.2d 382, 383 (2d Cir.1989) (citation omitted). "[E]ven if the agents might

have been able to obtain a warrant earlier in the day, their failure to do so at the first opportunity does not bar them from acting on an exigency that arises later." *Cattouse*, 846 F.2d at 147.

In addition, even if the agents had obtained a search warrant earlier in the day, it would not have solved the predicament with which they were faced when Lopez rushed into the Chatwal Inn. Since the agents believed that the transaction was to be completed at Carlos's room at the Marriott, any warrant that they would have obtained earlier in the day would have been for Carlos's room at the Marriott, not for Lopez's room at the Chatwal. This warrant would have been useless when the agents, seeing Lopez hurry to his room in the Chatwal, needed to enter this room.

■ Contrary to Lopez's and Trujillo's contentions, a telephone warrant would have taken too long to obtain, since even that brief period of time would have allowed Lopez to escape and to destroy physical evidence. *See id.* at 147–48 ("it was reasonable for the agents to believe there was insufficient time to obtain a warrant, even by telephone * * * [since] 'a reasonable period of time, surely most often one longer than twenty minutes, must be allowed for reaching a magistrate.' ") (citing *United States v. Gallo–Roman*, 816 F.2d 76, 81 (2d Cir.1987)).

■ The final argument concerning the warrantless entry, made at oral argument, is that by knocking on the door of Lopez's hotel room and loudly announcing that they were from the DEA, the agents themselves created the exigent circumstances that they then used to justify their warrantless entry. We have recently rejected this argument in our *in banc* decision in *MacDonald*, where we held:

Exigent circumstances are not to be disregarded simply because the suspects chose to respond to the agents' lawful conduct [knocking on the door and announcing themselves] by attempting to escape * * * [or] destroy[ing] evidence * * *. The fact that the suspects may reasonably be expected to behave illegal-

ly does not prevent law enforcement agents from acting lawfully to afford the suspects the opportunity to do so.

*MacDonald,* 916 F.2d at 771.

For all of these reasons, the district court's refusal to suppress the physical evidence and statements of Lopez and Trujillo was not clearly erroneous.

## B. Evidentiary Ruling.

Trujillo and Lopez argue that the district court erred in permitting Boisvert, who does not speak Spanish, to testify as to statements made in Spanish by Trujillo and Lopez, which were translated for him by Betancourt. The two defendants argue that these statements were inadmissible hearsay. We reject this argument.

■■ Except in unusual circumstances, an interpreter is "no more than a language conduit and therefore his translation [does] not create an additional level of hearsay." *United States v. Koskerides,* 877 F.2d 1129, 1135 (2d Cir.1989). Lopez and Trujillo offer no reason to doubt the accuracy of her translation. Both defendants spoke English and were present when Betancourt translated their conversation to Boisvert, and it stands to reason that if she had distorted their conversation, they would have noticed it and corrected her. In a situation such as this one, "the translator is normally to be viewed as an agent of the defendant; hence the translation is attributable to the defendant as his own admission and is properly characterizable as non-hearsay under Rule 801(d)(2)(C) or (D) [of the Federal Rules of Evidence]." *United States v. Da Silva,* 725 F.2d 828, 831 (2d Cir.1983).

■ Even if we were to view Betancourt's statement as distinct from Boisvert's, it still would be admissible, since Rule 801(d)(2)(E) of the Federal Rules of Evidence states that "a statement by a coconspirator" is not hearsay. Betancourt's statement, which clearly "apprise[d] a coconspirator of the progress of a conspiracy", *United States v. Rahme,* 813 F.2d 31, 36 (2d Cir.1987), was admissible under Rule 801(d)(2)(E). The evidence

at trial demonstrated that Betancourt was more than just an acquaintance of the members of the conspiracy and was herself a coconspirator: she insisted on coming to New York City to complete the sale of the cocaine, and apparently she signed for the charges on Lopez's mother's American Express card.

For both of these reasons, we reject this argument.

## C. Mention of a Prior Crime in the Prosecutor's Summation.

■ According to Vasquez, the prosecutor, in his summation to the jury, improperly referred to Boisvert's testimony that Lopez had shown him 150 kilograms of cocaine. According to Vasquez, the prosecutor improperly offered this evidence as proof of the conspiracy in which he was charged, which was improper since there was no evidence linking Vasquez to the 150 kilograms. Vasquez speculates that the jury convicted him of conspiracy on the strength of the testimony of the existence of the 150 kilograms.

Vasquez's argument lacks merit. First, viewed in context, the prosecutor's remark concerning the 150 kilograms was part of a proper chronological summation of the events that led to the defendants' arrest. Vasquez was not mentioned in connection with the 150 kilograms, and there is no evidence that the prosecutor in any way suggested a link between Vasquez and this initial, large quantity of cocaine. In fact, Vasquez was first mentioned by the prosecutor some nine transcript pages later, when the prosecutor referred to the events in New York City. Accordingly, it is highly unlikely that the jury linked Vasquez with the 150 kilograms. Second, the district judge, in his instructions to the jury, cured any possible confusion on this issue by explicitly stating that the evidence of the 150 kilograms was only to be used against Lopez.

For both of these reasons, we reject this argument.

### D. Jury Instructions.

Defendants argue that the district judge's conspiracy charge was biased toward the government and that they were therefore denied a fair trial. Lopez also asserts that he was entitled to a derivative entrapment charge. These claims are frivolous.

■ In the portion of the conspiracy charge to which the defendants object, the district judge stated that conspiracy poses "a greater potential threat to the public interest than the illegal activity of a single individual since it often makes possible the attainment of ends more complex than those which an individual acting alone could accomplish." Defendants claim that this statement biased the jury against them. However, it was well within the district judge's discretion to attempt to clarify the meaning of conspiracy for the jury, and the district court's definition is almost identical to a description of conspiracy given by the Supreme Court. *See e.g., Callanan v. United States,* 364 U.S. 587, 593–94, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961) (a conspiracy "presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality."). Lopez and Trujillo may not have liked the tone of the district court's explanation of conspiracy, but this tone is inherent in the crime itself and cannot in any way be attributed to an unfair charge.

■ Lopez also asserts that he was entitled to a derivative entrapment charge, since he argued on summation that Betancourt was used by Boisvert to "induce" him "to cooperate in entering the drug trade." However, Lopez did not request this charge at the charging conference, nor did he object when the jury was instructed without it. He has therefore waived this claim. *See* Fed.R.Crim.P. 30 ("No party may assign as error any portion of the [jury] charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection."). *See also United States v. Friedman,* 854 F.2d 535, 554–56 (2d Cir.1988), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). Since the absence of such a charge was not plain error, we may not address it. *See* Fed.R.Crim.P. 52(b).

### E. Sentencing.

All three defendants raise sentencing issues. Lopez claims that the district judge failed to give specific reasons for his sentence, and also asserts that the district judge's calculation of his offense level was clearly erroneous. Trujillo argues that for sentencing purposes, the district court should have found him to be a "minimal" participant; he further claims that the district court erred in refusing to credit him for his acceptance of responsibility. Vasquez asserts that the district judge erred in refusing to conclude that he was a "minor" participant, and failed to state reasons for his sentence. We reject all of these claims.

#### 1. Lopez.

■ 18 U.S.C. § 3553(c) requires the district court, at the time of sentencing, to "state in open court the reasons for its imposition of the particular sentence", and, in subsection 3553(c)(1), if the range for a particular sentence exceeds 24 months, to state the reason "for imposing a sentence at a particular point within the range". We have recently held, in a case under subsection 3553(c)(1), that the statements made at the time of sentencing must demonstrate that the district judge "thoughtfully discharged his statutory obligation, with a degree of care appropriate to the severity of the punishment ultimately selected." *United States v. Chartier,* 933 F.2d 111, 117 (2d Cir.1991).

■ Lopez claims that the district judge, in imposing a sentence of 216 months upon him, failed to offer sufficient reasons to satisfy these requirements, since the reasons offered all concerned only "generalized deterrence". We reject this claim. In the first place, the district

judge's statement about generalized deterrence, which Lopez specifically pinpoints, was made in a different context—that of rejecting Lopez's request for the statutory minimum of ten years, which would have required an adjustment.

Secondly, a review of all the district judge's statements as he sentenced Lopez reveals that he explicitly stated the specific reasons for arriving at a total offense level of 36, (which was the base level assigned to Lopez in the pre-sentence report prepared by the probation department); that he explained the factors that led him to impose a sentence of 216 months (out of a guidelines range of 188–235 months); that he rejected the probation department's recommendations that Lopez be given a two-point adjustment for a managerial role and a two-point adjustment for obstruction of justice; and that he had carefully considered Lopez's psychological history, including emotional stress. He concluded by stating, "[t]hose are all the factors and weighing them together, I impose a sentence of 18 years", which represented the middle of the selected guidelines range.

In order to avoid any possible dispute, the district court might well have emphasized that the reasons that he gave in imposing a sentence of 216 months reflected both his consideration of the imposition of the particular sentence as required by section 3553(c), and the relationship of that particular sentence to the applicable sentencing range, as required by § 3553(c)(1). However, his statements here are sufficient. From the context it is clear that the district court carefully considered both of these requirements in arriving at his sentence of 216 months, and that he "thoughtfully discharged his statutory obligation, with a degree of care appropriate to the severity of the punishment ultimately selected." *Id.*

▮▮▮▮ Lopez also contends that the district court's determination of an offense level of 36 was erroneous, because this determination was based on the assumption that Lopez was involved in a conspiracy to sell 50 or more kilograms of cocaine. Lopez points out that the guidelines make it

clear that in a sentencing for conspiracy involving a controlled substance, if the defendant "was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing." U.S.S.G. § 2D1.4, comment. (n.1). Lopez contends that he was incapable of producing 50 kilograms of cocaine. He makes this argument despite: testimony at trial that a few weeks before the attempted transaction he said he possessed in excess of 100 kilograms; his statement to the DEA agents that he was involved in a conspiracy to distribute 50 kilograms of cocaine; the fact that the kilogram of cocaine that was found in Lopez's hotel room was 93% pure, which suggests that Lopez was a well-connected dealer, capable of obtaining a large quantity of cocaine. In light of this evidence, the district court's conclusion was not clearly erroneous. *See United States v. Lanese,* 890 F.2d 1284, 1291 (2d Cir. 1989), *cert. denied,* — U.S. ——, 110 S.Ct. 2207, 109 L.Ed.2d 533 (1990).

### 2. Trujillo.

Trujillo contends that the district court incorrectly applied the Guidelines by refusing an adjustment for his minimal role in the offense and for his acceptance of responsibility. Neither of these claims has merit.

▮▮▮▮ The district judge gave Trujillo a two-point reduction for "minor" participation. Not satisfied with this reduction, Trujillo asserts that because his "role cannot be discerned from the record, it would be inappropriate to consider him anything more than a 'minimal' participant." In requesting such a reduction, the defendant bears the burden of proving by a preponderance of the evidence that his role in the offense was a minor one. *See United States v. Garcia,* 920 F.2d 153, 156 (2d Cir.1990) (per curiam). To the extent that the defendant's role cannot be discerned from the record, he has not carried his burden. Trujillo offers no basis for his assertion that any ambiguity as to his role

in the conspiracy should be resolved in his favor, and certainly the district judge "is not bound to accept a defendant's own declarations, made with the purpose of reducing his sentence, about the circumstances of his crime." *United States v. Buenrostro*, 868 F.2d 135, 138 (5th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1957, 109 L.Ed.2d 319 (1990).

■■■ Furthermore, the Guidelines are clear that "the downward adjustment for a minimal participant will be used infrequently". U.S.S.G. § 3B1.2, comment. (n. 2). We have held that a "steerer" in a drug transaction—an individual who directs buyers to furtive sellers—was not a "minimal participant" because he "demonstrated his knowledge of the [drug] scheme and of the activities of other participants." *United States v. Colon*, 884 F.2d 1550, 1552 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 553, 107 L.Ed.2d 550 (1989). In the present case, there was clear evidence to indicate that Trujillo was more than the type of minimal participant contemplated by the Guidelines: he knew of the plan to sell 50 kilograms of cocaine; he travelled from Miami to New York to help with the transaction; and there was testimony that he expected a large payment for his services. This is hardly minimal participation, and the district court's conclusion to refuse an adjustment on this basis was not erroneous. *See United States v. Parker*, 903 F.2d 91, 103–04 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990).

■■■ Trujillo also argues that he should have received an adjustment for his acceptance of responsibility. Prior to sentencing, Trujillo acknowledged that he had travelled to New York City to assist in a one-kilogram transaction, but he continued to maintain that he had no involvement in the 50–kilogram transaction. He argues that "since the proof of his involvement in that larger transaction was not overwhelming", his refusal to acknowledge his participation in the larger transaction should not be held against him.

■■■ This frivolous argument does not warrant extended discussion. The stan-

dard that the district court is required to apply in calculating the defendant's base offense level is not "overwhelming" evidence, as Trujillo implies, but a "preponderance" of the evidence. *See United States v. Guerra*, 888 F.2d 247, 251 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990). It is also clear that "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance." U.S.S.G. § 2D1.4, comment. (n. 2). The Guidelines also state that "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. § 3E1.1, comment. (n. 5). For all of these reasons, the district court was entitled to conclude that Trujillo failed to demonstrate "a recognition and affirmative acceptance of personal responsibility for his criminal conduct" as required to obtain a two-level reduction under Guidelines § 3E1.1(a). *See United States v. Moskowitz*, 883 F.2d 1142, 1154–55 (2d Cir.1989).

3. Vasquez.

■■■ Vasquez asserts that the district judge erred in refusing his request for a two-level reduction as a "minor" participant. In support of this argument, he points out that while the presentence report concluded that Lopez was the most culpable and that he was the least culpable of the coconspirators, the district court nevertheless gave them both the same sentence. Vasquez claims that the district judge failed to comprehend the distinction between "minor" and "minimal" participants under the Guidelines, since the district judge rejected his request for an adjustment as a minor participant by stating that his participation was "not minimal". Finally, he asserts that the district judge failed to give reasons for the sentence he imposed. We reject these arguments.

Vasquez suggests that in determining his offense level, the district judge was required to compare his culpability with

those of the other defendants in his case and then adjust his level based upon culpability. According to Vasquez, the conduct of his co-defendants is the only relevant conduct—other than his own—in determining his offense level. In support of his position, he points to application note 3 of § 3B1.2, which states that "a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal."

According to Vasquez, he was clearly less culpable than were the other defendants, and he was therefore entitled to a reduction as a minor defendant. We reject this argument. The intent of the Guidelines is not to "reward" a guilty defendant with an adjustment merely because his coconspirators were even more culpable. The background commentary to § 3B1.2 states that "[t]his section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the *average* participant." (emphasis added). While the commentary itself is ambiguous as to whether the word "average" refers to the participants of the particular concerted activity, or just to concerted activity in general, we have clearly held that

> "[w]hether a defendant may be accorded the benefit of a 'minor' or 'minimal' role adjustment under § 3B1.2 does not turn solely upon his status or his assigned task in the criminal enterprise. Such a cramped view of 'role' is inconsistent with the prescription in the Guidelines that this determination is to be made not with regard to status in the abstract but rather with regard to the defendant's culpability in the context of the facts of the case."

*Garcia*, 920 F.2d at 155.

Other circuits that have addressed this issue have also concluded that the defendant's role in the offense is determined "not only by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable, * * * but also by measuring each participant's individual acts and rela-

tive culpability against the elements of the offense of conviction * * *." *United States v. Daughtrey*, 874 F.2d 213, 216 (4th Cir.1989) (Wilkins, J.). *See also United States v. Mueller*, 902 F.2d 336, 345–46 (5th Cir.1990), *United States v. Tholl*, 895 F.2d 1178, 1185–86 (7th Cir.1990).

In rejecting Vasquez's argument that he was entitled to a two-level adjustment for his "minor" role in the offense, the district judge stated that Vasquez's role was "not minimal". Vasquez correctly points out that the difference under the Guidelines between "minimal" and "minor" is not just semantic; rather, both are terms of art that result in different adjustments. While the district judge should have been more careful in choosing his words, the context of the statement makes it clear that the district judge's refusal to adjust the sentence was not a failure to recognize an important distinction but instead was "a simple misstatement not affecting the sentence." *United States v. Campuzano*, 905 F.2d 677, 681 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 363, 112 L.Ed.2d 326 (1990).

■ It is not the case, as Vasquez implies, that the district judge did not realize that there was a difference between "minor" and "minimal" roles under the Guidelines: the district judge reduced Trujillo's offense level two points as a "minor" participant, while explicitly rejecting his claim to "minimal" status. In addition, the district judge rejected Vasquez's claim that he was a "delivery boy", finding that he worked closely with Carlos, who was Lopez's supplier.

■ Vasquez's last argument is that the district judge failed to give reasons for the sentence he imposed upon Vasquez, and that his "sentence cries for explanation." Vasquez received a sentence that was slightly above the middle of his offense level range. The government had requested an adjustment for obstruction of justice because Vasquez had submitted misleading information to the probation department. The district judge rejected this request, but explicitly stated that in selecting a sentence within Vasquez's guidelines

range, he would take into account Vasquez's attempt to mislead the court. The district judge also concluded that Vasquez worked closely with Carlos, that he "was close to the source of supply." Together these statements satisfy the requirements of § 3553(c)(1).

## CONCLUSION

We have considered all of the defendants' arguments and find them to be without merit. Accordingly, we affirm the judgments of conviction.