Pedro CRUZ–REYES, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8207.

Court of Appeals of Alaska.

July 25, 2003.

**64.** *See id.* at 457.

J. Jake Ketscher, Assistant Public Defender, Kodiak, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Joseph S. Slusser, Assistant District Attorney, J. Michael Gray, District Attorney, Kodiak, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

On April 11, 2001, Alaska State Troopers searched the Kodiak residence of Pedro Cruz–Reyes and found a "black box" connected to his television set—*i.e.*, an electronic device capable of converting or unscrambling cable television signals, thus allowing Cruz–Reyes to view all of the premium cable services offered by General Communication, Inc. (GCI) in the Kodiak area. Cruz–Reyes was a GCI subscriber, but he paid only for the standard cable package, not any of the "premium" cable packages—packages which included various movie channels, pay-per-view events, and other higher-cost television entertainment.

After the troopers found the black box, they interviewed Cruz–Reyes. Cruz–Reyes's native tongue is Spanish, so the trooper leading the investigation (Trooper Charles Cross) questioned Cruz–Reyes through a translator—Trooper Hervey López Ibarra, whose native tongue is Spanish and who had served as a translator when he was in the military.

Through this interpreter, Cruz–Reyes told the troopers that he had purchased the black box from a co-worker whose name he did not provide, and that the device had been installed on his television for the past four months. Ultimately, Cruz–Reyes was charged with

third-degree theft of services (services having a value of at least $50 but less than $500).[1] Following a jury trial in the Kodiak district court, Cruz–Reyes was convicted of this offense.

In this appeal, Cruz–Reyes argues that his conviction is not supported by the evidence, that the jury was misinstructed on the elements of third-degree theft of services, and that the trial judge committed procedural and evidentiary errors that prejudiced the fairness of the trial. For the reasons explained here, we reject Cruz–Reyes's various assertions of error, and we therefore affirm his conviction.

*Did the charge of theft of services require the State to prove that Cruz–Reyes actually watched the premium cable channels that he had not paid for? Or was the offense established by proof that Cruz–Reyes altered his television so that he could view these channels if he wished?*

As defined in AS 11.46.200(a)(1), a person commits theft of services if, through the use of "deception ... or other means to avoid payment for the services", the person "obtains services [which the person knows are] available only for compensation". And, with respect to the theft of services, the word "obtain" is defined in AS 11.46.990(12)(B) as "secur[ing] performance of the service".

Cruz–Reyes's appeal presents a question concerning the meaning of "obtain" in the context of unauthorized access to cable television channels. Cruz–Reyes asserts

that, in this context, "obtaining" premium cable channels means actually watching these channels. Only then, Cruz–Reyes argues, can it be said that the defendant has "secured performance of the service". According to this argument, it was not sufficient for the State to prove that Cruz–Reyes had modified his television so that he might watch the premium channels if he wished. Rather, the State was obliged to prove that Cruz–Reyes (or other people, at his invitation) had actually watched unpaid—for television shows on these channels.

This legal issue came up at Cruz–Reyes's trial when the parties discussed the jury instructions. Superior Court Judge Donald D. Hopwood, sitting in the District Court, ultimately rejected Cruz–Reyes's interpretation of the word "obtains". Instead, Judge Hopwood gave the following jury instruction:

> In relation to services, "obtain" means to secure performance of the service. To secure performance of the service, a person must have access to, or be able to use, the service. The person need not actually use or benefit from the service.

On appeal, Cruz–Reyes renews his contention that this jury instruction was wrong and that the State was obliged to prove that he actually watched television programs on the premium channels that he was not paying for.

The statutes dealing with theft of services vary a good deal from state to state; because of this, there is little pertinent case law from other jurisdictions to help us resolve this issue of law.[2] We have also examined the

---

1. AS 11.46.100(5) and AS 11.46.200(a) (defining theft of services); AS 11.46.140(a)(1) (defining theft in the third-degree).

2. For example, Pennsylvania's theft of services statute, 18 Pa.Cons.Stat.Ann § 3926(a)(1) (West 2003), contains language that explicitly covers the type of conduct involved in this case:

   A person is guilty of theft if he intentionally obtains services for himself or for another which he knows are available only for compensation, by deception or threat, by altering or tampering with the public utility meter or measuring device by which such services are delivered or by causing or permitting such altering or tampering, by making or maintaining any unauthorized connection, whether physically, electrically or inductively, to a distribution or transmission line, *by attaching or maintaining the attachment of any unauthorized device to any cable, wire or other component of an electric, telephone or cable television system or to a television receiving set connected to a cable television system, [or] by making or maintaining any unauthorized modification or alteration to any device installed by a cable television system, or by false token or other trick or artifice to avoid payment for the service.*

   Similarly, Wisconsin has a statute, Wis.Stat. Ann. § 943.46 (West 2003), that is specifically directed toward theft of cable television service. Section (2)(a) of this statute makes it a crime to "[o]btain or attempt to obtain cable television service from a company by trick, artifice, deception, use of an illegal device or illegal decoder or other fraudulent means with the intent to deprive that company of any or all lawful compensation

commentary to the Model Penal Code's theft of services provision (§ 223.7), but this point is not discussed in that commentary. Nevertheless, we conclude that Judge Hopwood's interpretation of the statute is correct.

As explained above, the definition of theft that pertains to this case is derived from reading AS 11.46.200(a)(1) and AS 11.46.990(12)(B) in conjunction. According to these two statutes, theft of services consists of using deception (or any other means to avoid payment) to secure performance of a service that the defendant knows is available only for compensation.

Cruz–Reyes concedes that the State's evidence was sufficient to prove that, without notifying the cable television provider and paying the appropriate monthly fee, he installed a machine that decoded the cable television provider's premium channels—thus enabling his television set to display the programs offered on these premium channels. The question is whether, by this conduct, Cruz–Reyes "secured performance" of the premium cable television service.

Cruz–Reyes argues that a person does not "secure performance" of a cable television service unless the person actually watches the programs that are broadcast via the cable. But this is not the normal understanding of cable service. Generally, people who subscribe to a cable television service are billed a monthly fee that is based, not on how many shows they actually watch, but rather on the selection of channels to which they have access. With the exception of special "pay-per-view" movies and sporting events, the subscriber's fee for cable access does not vary according to how many television shows the subscriber actually watches. Rather, the fee is for access—the *opportunity* to watch shows if one wishes to. Thus, the monthly fee remains the same whether the subscriber sits glued to the television for hours per day or, instead, vacations for several weeks in the south of France and never once turns on their home television.

We therefore conclude that the challenged jury instruction was correct. When Cruz–Reyes installed the equipment that allowed him *access* to the programs on his cable television provider's premium channels, he "secured performance" of the premium cable service, even if he never watched any of the programs on these channels.

*Cruz–Reyes's motion for a judgement of acquittal*

■ In a related argument, Cruz–Reyes argues that Judge Hopwood should have granted him a judgement of acquittal because the State's evidence was not sufficient to support the charge of theft.

The first part of Cruz–Reyes's argument involves the issue we have just resolved—*i.e.,* whether theft of cable services requires proof that the defendant actually watched cable programs without paying, or whether the offense is proved by evidence that the defendant obtained access to these programs without paying. As we explained in the previous section of this opinion, access is sufficient.

Cruz–Reyes then argues that, even if access is sufficient, the State never proved that he actually had access to the premium channels. Cruz–Reyes points out that the troopers who came to his house never flipped through the channels to see what channels his television set was actually receiving. Thus, Cruz Reyes argues, the State's evidence was insufficient to prove that his television was capable of receiving and displaying the unauthorized cable programming.

As Judge Hopwood noted when he denied Cruz–Reyes's motion for judgement of acquittal, the question is whether there was sufficient evidence for a reasonable jury to conclude that, by attaching the black box to his television, Cruz–Reyes obtained access to the programs on the premium cable channels. The judge pointed out that, according to the testimony, the black box had been hooked up to Cruz–Reyes's television for four months. The judge further pointed out that,

for rendering each type of service obtained." And section (2)(d) of this statute makes it a crime to "[m]ake or maintain a connection, whether physical, electrical, mechanical, acoustical or by other means, with any cables, wires, components or other devices used for the distribution of cable television services for the purpose of obtaining cable television service without payment of all lawful compensation to the company providing that service."

after the troopers seized the black box from Cruz–Reyes's residence, technicians at GCI connected the black box to their system to see what channels it would decode and give access to. They found that the black box permitted display of every channel that their company distributed via cable.

Based on this evidence, a reasonable jury could conclude that the black box gave Cruz–Reyes access to these same channels when it was connected to his television. Thus, the State's evidence was sufficient to establish Cruz–Reyes's guilt of theft of the premium cable services. (As explained earlier, Cruz–Reyes was paying for the standard cable service.)

*Does a witness's testimony concerning a person's statements take on an added layer of hearsay if those statements are related to the witness through an interpreter?*

As explained above, Trooper Cross interviewed Cruz–Reyes through an interpreter—his colleague, Trooper Ibarra. At trial, Trooper Cross testified concerning the statements that Cruz–Reyes made during this interview.

Under Alaska Evidence Rule 801(d)(2)(A), a criminal defendant's out-of-court statements are not hearsay if they are introduced by the State. But this rule assumes that the State's witness (the one who testifies about the defendant's statements) is speaking from first-hand knowledge—that the witness is a person who heard the defendant make those statements. In the present case, Trooper Cross "heard" Cruz–Reyes make the statements at issue here, in the sense that Trooper Cross was in Cruz–Reyes's presence and could hear him speaking. But Cross did not understand what Cruz–Reyes was saying. Cruz–Reyes's statements were intelligible to

Cross only because of Trooper Ibarra's translation.

For this reason, Cruz–Reyes asserts that Cross's testimony contained an extra layer of hearsay. That is, Cross was not really testifying about what he heard Cruz–Reyes say. Rather, Cross was testifying about Ibarra's version of what Cruz–Reyes said. Thus, Cruz–Reyes argues, Cross's testimony was not admissible over Cruz–Reyes's hearsay objection.

Whether an out-of-court interpreter or translator adds another layer of hearsay to a witness's testimony appears to be an issue of first impression in Alaska. The State asks us to adopt the "language conduit" rule set out in *United States v. Koskerides*, 877 F.2d 1129, 1135 (2nd Cir.1989)—the rule that a translator who acts as a mere "language conduit" does not add an extra layer of hearsay. Cruz Reyes, for his part, argues that the *Koskerides* decision is unpersuasive and represents bad law.

Our research suggests that *Koskerides* may in fact represent the majority view. The federal and state courts that have addressed this issue in recent years have generally held that an interpreter does not add another layer of hearsay—either under the theory that the interpreter acted as an agent of the declarant, or under the theory that the interpreter acted merely as a language conduit between the participants in the conversation (or some combination of the two theories).[3]

It therefore appears that the weight of recent authority favors the rule that a translator—at least, a translator who is capable and fair—does not add another layer of hearsay to a conversation. In Cruz–Reyes's case, Trooper Ibarra was a native speaker of Spanish who had previously worked as a translator in the military. Moreover, the

---

**3.** Federal Courts: *United States v. Beltran*, 761 F.2d 1, 9 (1st Cir.1985); *United States v. Lopez*, 937 F.2d 716, 724 (2nd Cir.1991); *United States v. Da Silva*, 725 F.2d 828, 831–32 (2nd Cir.1983); *United States v. Nazemian*, 948 F.2d 522, 526 (9th Cir.1991); *United States v. Álvarez*, 755 F.2d 830, 859–860 (11th Cir.1985). *See generally,* Beth Bates Holliday, *Interpreter or Translator as Party's Agent for Purposes of "Admission by Party-Opponent" Exception to the Hearsay Rule (Fed-*

*eral Rules of Evidence, Rules 801(d)(2)(C), 801(d)(2)(D)),* 121 A.L.R.Fed. 611 (1994).

State Courts: *Correa v. Superior Court,* 27 Cal.4th 444, 117 Cal.Rptr.2d 27, 40 P.3d 739, 746–751 (2002); *State v. Randolph,* 698 S.W.2d 535, 538–39 (Mo.App.1985); *State v. Patino,* 177 Wis.2d 348, 502 N.W.2d 601, 610 (App.1993); *State v. Robles,* 157 Wis.2d 55, 458 N.W.2d 818, 821–22 (App.1990).

defense did not question the accuracy of Ibarra's translation (either his translation of Cross's words into Spanish or his translation of Cruz–Reyes's words into English). Given these circumstances, there would appear to be no hearsay impediment to having Cross testify about Cruz–Reyes's statements.

■ However, we need not definitively resolve this issue of hearsay law to resolve Cruz–Reyes's appeal. Cross was not the only witness who testified about the conversation with Cruz Reyes; Ibarra did too. Because Ibarra's account of the conversation was the same as Cross's, and because the defense did not attack the accuracy of that account, we conclude that any arguable error in allowing Cross to describe the conversation was harmless.

*The issues surrounding the testimony of Timothy Brady*

During the trial, an interpreter sat with Cruz–Reyes and translated the proceedings to him. The prosecutor believed that the interpreter's presence was a latent attack on the State's case: for if Cruz–Reyes understood so little English that he needed an interpreter in court, why would Cruz–Reyes want to steal cable television programming that was in English?

To help establish Cruz–Reyes's motive for stealing the cable services, the prosecutor decided to call a witness who knew Cruz–Reyes and could testify that he was conversant in English. This witness was Timothy Brady, an officer with the Immigration and Naturalization Service.

Although Brady had dealt with Cruz–Reyes on a number of occasions, Brady did not remember Cruz–Reyes by name. The prosecutor asked Brady to attend court on the second day of the trial, to see if Brady recognized Cruz–Reyes. Brady did recognize Cruz–Reyes, and he told the prosecutor that he was ready to testify (1) that he had spoken to Cruz–Reyes a number of times, and (2) that Cruz–Reyes was able to speak and understand English. At this point, the prosecutor notified the defense attorney that

he intended to call Brady to testify about Cruz–Reyes's proficiency in English.

The defense attorney objected that Brady had not been disclosed as a potential witness when the State made its pre-trial disclosure under Alaska Criminal Rule 16(b). However, when Judge Hopwood asked the defense attorney to explain how Cruz–Reyes was prejudiced by this late addition to the State's witnesses, the defense attorney did not claim that he was prejudiced by the short notice, nor did he ask for additional time to prepare for Brady's testimony. Instead, he switched gears and argued (1) that Brady's testimony was not relevant, and (2) that the jurors would be prejudiced against Cruz–Reyes when they found out that Brady was an INS officer. Based on the defense attorney's response (in particular, the defense attorney's failure to claim prejudice), Judge Hopwood ruled that Brady's testimony would not be excluded on the ground that the defense had received short notice of the proposed testimony.

■ On appeal, Cruz–Reyes asserts that he was, in fact, prejudiced by the short notice of Brady's testimony—that his defense attorney did not have an adequate opportunity to prepare to cross-examine Brady concerning Cruz–Reyes's proficiency in English. But this argument was not presented to Judge Hopwood. As this Court stated in *Collins v. State*, "[When] the defense claims a mid-trial discovery violation, the defendant must present the trial court with a plausible claim of prejudice and request appropriate relief." [4]

■ Cruz–Reyes also renews his argument that Brady's testimony was not relevant. But Cruz–Reyes's proficiency in English was relevant to his motive (or lack of motive) to steal the cable television programming. Thus, Brady's testimony (that Cruz Reyes could understand and speak English) was relevant to the issues being litigated.

■ Finally, Cruz–Reyes argues that he was prejudiced by the fact that Brady was an officer for the Immigration and Naturalization Service. He contends that if the jurors knew that Brady was an INS officer, the

---

**4.**   977 P.2d 741, 745 (Alaska App.1999).

jurors would infer that Brady was acquainted with Cruz–Reyes because Cruz–Reyes had committed other crimes or had violated United States immigration laws. But Cruz–Reyes's argument is speculative.

First, Brady was never identified to the jurors as an INS officer. When this issue came up at trial, the prosecutor explained that he did not intend to introduce any evidence of Brady's profession or the reasons for Brady's acquaintance with Cruz–Reyes. Brady would simply testify that he knew Cruz Reyes, that he had spoken with Cruz–Reyes on a number of occasions, and that Cruz–Reyes had no apparent difficulty understanding English.

Cruz–Reyes suggests that it is possible that one or more members of the jury recognized Brady as an INS officer. But the defense attorney did not ask to voir dire the jurors concerning their knowledge of Brady. Moreover, even if one or more jurors had recognized Brady as an INS agent, there was no testimony that Brady's acquaintance with Cruz–Reyes stemmed from official business of the INS.

Finally, even if the jurors had known that Brady was an INS officer and had surmised that his knowledge of Cruz–Reyes stemmed from official business, it is complete speculation that the jurors would have further concluded that this official business involved misconduct on the part of Cruz–Reyes. Thousands of foreign nationals meet with INS officers in the normal process of obtaining work and/or residency in this country. Even if the jurors somehow surmised that Cruz–Reyes had spoken several times with an officer of the INS, this does not lead to the conclusion that Cruz–Reyes had broken the law on past occasions.

For these reasons, we uphold Judge Hopwood's decision to allow the State to present the testimony of Timothy Brady.

*Conclusion*

The judgement of the superior court is AFFIRMED.